**CHROME PLATE, INC.**

v.

**DISTRICT DIRECTOR OF INTERNAL REVENUE.**

**No. SA–75– 68–BK.**

United States District Court,
W. D. Texas,
San Antonio Division.

Nov. 7, 1977.

John D. Harris, San Antonio, Tex., for bankrupt or debtor—appellee.

William W. Guild, Tax Div., Dept. of Justice, Dallas, Tex., for defendant, Dist. Director of Internal Revenue—appellant.

## MEMORANDUM ORDER

SUTTLE, District Judge.

This case comes before the court on an appeal by the Defendant from a decision of the bankruptcy court. Jurisdiction is founded on § 23 of the Bankruptcy Act, 11 U.S.C. § 46.

There are three issues on appeal: the Defendant alleges that the bankruptcy court lacked subject-matter jurisdiction to entertain the Plaintiff's claim that it was owed a tax refund by the United States; the Defendant maintains that the bankruptcy court erred in allowing Plaintiff's subsidiary to take a stepped-up basis in assets received in the liquidation of six corporations, contending that § 334(b)(1) of the Internal Revenue Code, 26 U.S.C. § 334(b)(1), applies to the transaction; and the Plaintiff now asserts that it is entitled to attorney's fees under The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Since this is a Chapter XI rearrangement, the Plaintiff bankrupt has been allowed to function as a debtor in possession.

### I

During the proceedings below, the bankruptcy judge upheld the Plaintiff's claim that it was entitled to an income tax refund of $135,557.18 from the United States. The gist of the claim was that an account receivable became worthless during 1973, thus giving rise to a bad business debt.[1] The law is settled that an income tax refund based on payments made prior

---

1. The Plaintiff originally filed its claim for a refund with the Internal Revenue Service on June 7, 1976.

to the filing of a bankruptcy petition constitutes "property" to which title vests in the trustee under § 70(a)(5) of the Bankruptcy Act, 11 U.S.C. § 110(a)(5). *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). The Government contends, however, that the Plaintiff pursued its refund claim in the wrong forum: that to the extent the Plaintiff was seeking affirmative relief the bankruptcy court was without subject-matter jurisdiction to entertain the complaint. This court finds that the Government is correct.

## A.

■ It is beyond dispute that, as a sovereign, the United States cannot be sued without its consent. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 141–42, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). By virtue of the Tucker Act, the United States has waived sovereign immunity and consented to be sued for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, 28 U.S.C. § 1346(a)(1). This is, of course, the exact nature of the Plaintiff's claim. Original jurisdiction to hear claims arising under the Act, however, is clearly limited under § 1346(a) to the district courts concurrent with the Court of Claims. The issue in this case thus becomes virtually indistinguishable from that confronted by the Ninth Circuit in *Danning v. United States*, 259 F.2d 305 (9th Cir. 1958), *cert. denied*, 359 U.S. 911, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959): whether a bankruptcy court has jurisdiction to hear a counterclaim for affirmative relief asserted by the trustee against the United States that arises out of the same transaction as the claim filed by the Government in the bankruptcy proceedings. The *Danning* court found that the bankruptcy court lacked jurisdiction, holding that, absent a specific statutory waiver, "an affirmative judgment against the United States cannot be entered on a counterclaim without specific statutory authorization for affirmative relief against the government on the counterclaim as such." 259 F.2d at 309–310.

■ The United States has specifically consented to waive sovereign immunity with regard to the type of claim involved here: a suit for the refund of "erroneously" collected taxes. However, Congress has also specifically authorized that such suits may only be brought in a district court or the Court of Claims. This rigid requirement is not waived simply because the United States asserts a claim for taxes in a bankruptcy proceeding and the trustee wishes to raise a counterclaim and resolve both matters at once. The court is not unmindful of the purposes behind the Bankruptcy Act, especially the need and desirability for swift and complete adjudication of all of a bankrupt's debts and claims in a single proceeding. Nevertheless, if there is a clash between the purposes of the Bankruptcy Act and the principle of sovereign immunity, it is the Bankruptcy Act that must yield. As Professor Wright has written:

> Moreover, if Congress in fact has consented to a particular kind of suit, it may define the conditions under which it is willing to be sued and the general rule long has been that the government's consent is to be strictly interpreted. Thus, for example, an action may be brought only in the court designated . . . 14 Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction § 3654, pp. 160–161 [footnotes omitted].

The Supreme Court reaffirmed this principle only last term in *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). *See also Safeway Portland E.F.C.U. v. Federal Dep. Ins. Corp.*, 506 F.2d 1213, 1216 (9th Cir. 1974). Thus, the court finds that the strict limitations of 28 U.S.C. § 1346(a)(1) preclude the bankruptcy judge from exercising subject-matter jurisdiction over the Plaintiff's claim.

## B.

■ In order to avoid potential problems in future litigation, the court believes it necessary to correct a fundamental error

in the bankruptcy judge's findings. The judge held that even a strict construction of § 1346(a)(1) would not present a bar to that court's reaching a determination of the Plaintiff's claim. He based his conclusion upon the definition given "courts of bankruptcy" by § 1(10) of the Bankruptcy Act, 11 U.S.C. § 1(10):

> [they] shall include the United States district courts and the district courts of the Territories and possessions to which this Act is or may hereafter be applicable.

From this definition, the bankruptcy judge apparently deduced that Congress intended for bankruptcy courts to function as district courts. This assessment is the exact converse of the situation. District courts have traditionally been empowered to sit as courts of bankruptcy. When they do so, their jurisdiction and powers are *limited* to those conferred upon them by the Bankruptcy Act. *First State Bank, etc. v. Sand Springs State Bank*, 528 F.2d 350, 353 (10th Cir. 1976). Bankruptcy courts also sit as courts of bankruptcy. That is all they do. They are not district courts, nor can they function as such. Their powers and jurisdiction are also derived solely from the scope of the Act, *Katchen v. Landy*, 382 U.S. 323, 327, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *In re Harwald Company*, 497 F.2d 443 (7th Cir. 1974); their jurisdictional bounds cannot exceed it.

## II

The second question before the court concerns the proper basis to be applied to assets that the Plaintiff received in the liquidation of six subsidiary corporations. The rules for determining such bases are found in I.R.C. § 334(b); subsection (1) provides the general rule, which requires a carryover basis, while subsection (2) provides a limited exception to that rule that allows a corporation to take a stepped-up or cost basis. The Government contends that the transaction by which the Plaintiff acquired its subsidiaries was a transfer within the purview of I.R.C. § 351; that a transfer of this nature

closes the door to a § 334(b)(2) exception thereby bringing the subsequent liquidation within the ambit of § 334(b)(1); and that, as a result, the Plaintiff's basis in the assets should equal that of the subsidiary corporations. The Plaintiff maintains that in passing § 334 Congress did not intend to preempt the doctrine of *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), aff'd per curiam, 187 F.2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951), which holds that, for purposes of determining tax liability, the substance of a transaction should be examined rather than the form: the ultimate purpose is the controlling factor rather than the various steps undertaken to achieve it. Applying that doctrine to its own transaction, the Plaintiff contends that, since its aim was to acquire the assets, the basis of those assets should be stepped-up to equal the Plaintiff's cost in acquiring them. The bankruptcy judge agreed with the Plaintiff and denied the Government's claim for $52,967.34 in income taxes. This court believes that the bankruptcy judge was in error and therefore reverses his decision.

The facts giving rise to the Government's claim are not in issue; they revolve around a series of corporate transactions by which the Plaintiff acquired six aircraft businesses owned by Clarence Page. On December 28, 1972, Page transferred all his stock in six corporations to Chrome Plate Industries, Inc. (CPII), a newly formed corporation (December 15, 1972) of which all the outstanding stock was owned by the Plaintiff.[2] Mr. Page received $850,000 in cash and notes for his stock. CPII then transferred its newly acquired Page stock to Page Industries of Oklahoma, Inc. (PIOI), in exchange for 849,000 shares of PIOI common stock. PIOI was itself a newly formed corporation (December 12, 1972) and was a wholly owned subsidiary of CPII, which, in turn, was a subsidiary corporation of the Plaintiff. The day after these transactions commenced, December 29, 1972, the Page

---

**2.** Mr. Page had a partner, Mr. O. J. Butts, who owned 20 percent of the stock in one of the companies. Mr. Butts also transferred his stock to CPII as part of the deal; therefore, for convenience sake, this order shall refer to the businesses as the Page corporations.

corporations were liquidated and PIOI succeeded to their assets. PIOI then stepped up the basis of those assets from their original cost to Page to their cost to PIOI, $849,000. It is this step-up that is in issue.

### A.

The court must begin its inquiry with an analysis of the applicable sections of the Internal Revenue Code. The general rule for determining the basis of property received by a corporation from the liquidation of a subsidiary is found in § 334(b)(1):

> If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor . . .[3]

Section 334(b)(2) permits a distributee to use its own cost as the basis for the assets if the distribution itself meets certain prerequisites. At issue here is the requirement detailed in § 334(b)(2)(B) that:

> stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote . . . was acquired by the distributee by purchase (as defined in paragraph (3)) . . .

Paragraph (3), § 332(b)(3)(B), specifically excludes from the definition of "purchase" stock that is acquired in an exchange to which § 351 applies. The Government contends that PIOI acquired the Page corporation stock by virtue of a § 351 exchange with CPII, which, therefore, renders § 334(b)(2) inapplicable to the transaction.

Section 351 governs transfers to a corporation controlled by the transferor. The general rule found in subsection (a) is:

> No gain or loss shall be recognized if property is transferred to a corporation . . . by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Control, as defined by § 368(c), "means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." It is uncontroverted that CPII was in control of PIOI within the meaning of § 368(c) immediately after the exchange.

Retracing its steps through this thoroughly tangled web of statutory intrigue, the court believes that the issue—as far as concerns the application of the Internal Revenue Code to the transactions in question—is this: if the transfer of Page stock from CPII to PIOI was a transfer within the meaning of § 351, then when PIOI subsequently liquidated the Page stock it was precluded from adopting a § 334(b)(2) cost basis for assets it received; it was required, instead, to carryover the original Page basis for those assets under the terms of the general rule announced in § 334(b)(1). Thus, the court again turns its attention to the requirements of § 351.

"Persons" as it appears in § 351 has been defined to include, among others, individuals, trusts, and corporations. Treas. Reg. 1.351–1(a)(1). Thus CPII fits the definition of a transferor ("one or more persons") under § 351. There remains, however, the question whether the Page company stock transferred to PIOI comes within the definition of "property" for purposes of a § 351 exchange. Although there is no single case that expressly rules on this point, there has been a recent revenue ruling holding that the sole transferred property in a § 351 exchange may be the stock of another corporation. *RevRul 74–502,* 1974–2 CB, p. 117. Further, courts that have examined the scope of § 351 "property" in other contexts are unanimous in

---

**3.** There is no dispute that the liquidation involved here was "within the meaning of section 332(b)."

holding that the term should be construed as broadly as possible. *See e. g. Hempt Bros., Inc. v. United States*, 490 F.2d 1172, 1175 (3rd Cir. 1974); *E. I. DuPont de Nemours and Co. v. United States*, 471 F.2d 1211, 1218–1219, 200 Ct.Cl. 391 (1973). Thus it seems clear to the court that, in terms of both the practical aspects of business life and the obvious intent of the statute, stock constitutes property within the meaning of § 351.

■ The court finds that the transfer of Page stock from CPII to PIOI was a § 351 exchange and, by the terms of § 334(b)(3)(B), does not fit the definition of a purchase necessary to permit PIOI to utilize the cost basis exemption provided by § 334(b)(2). When the corporate transactions are examined solely in accordance with the specific provisions of the Code, it is clear that PIOI was required to use the carryover basis for the assets mandated by § 334(b)(1).

### B.

■ The Plaintiff contends that, regardless of the specific language found in the Code, § 334(b)(2) was not intended to preempt the *Kimbell-Diamond* doctrine. The bankruptcy court upheld this contention and also agreed with the Plaintiff that in order to determine the proper basis for the assets the *Kimbell-Diamond* rule requires a court to look at the substance of transactions in question—the specific intent of the corporation—rather than at the form or procedure that the corporation undertook. Thus, the bankruptcy judge did not even attempt to first determine whether the Plaintiff was entitled to use § 334(b)(2) but, instead, simply ignored the Code and applied pre-1954 Internal Revenue Code case-law to the transaction and held for the Plaintiff. This court, having considered the legislative history of § 334 as well as the cases that have interpreted the validity of *Kimbell-Diamond* in light of that section's enactment, finds that both the purpose and the effect of that section was to codify and define the scope of the *Kimbell-Diamond* doctrine; therefore, the exception to the carryover basis rule afforded by that doctrine remains available only to the extent that a given liquidation meets the requirements of § 334(b)(2).

Three circuit courts of appeal and the Court of Claims have considered the impact § 334(b)(2) has had upon *Kimbell-Diamond*; only the Court of Claims has held that the doctrine remains intact. That court, in *American Potash & Chemical Corporation v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968), rejected the Government's argument that § 334(b)(2) was the exclusive exception to the carryover basis rule. The court stated that a review of the legislative history of the 1954 Code indicated that although § 334(b)(2) was intended to "establish a precise rule under which a taxpayer could proceed" assured that it could use a cost-basis for assets it received in a subsequent liquidation, the statute was not intended to preempt *Kimbell-Diamond*; the doctrine of that case remained available for corporations that wanted to utilize a cost-basis but neglected to insure that the transfers in question met the standards outlined in the statute. The difficulty with this interpretation is that its effect is to render § 334(b)(2) purposeless. If, as the Court of Claims suggests, a corporation has the option of either following the blueprint provided by § 334(b)(2) and taking a cost-basis or else ignoring those requirements and asserting *Kimbell-Diamond* to obtain that same cost-basis—to which, having failed to comply with the Code, it would otherwise no longer be entitled—then § 334(b)(2) is not a law but simply a piece of advice that Congress has graciously made available for those corporations that wish to claim a cost-basis without having to subsequently demonstrate their subjective intent.

There is not much legislative history regarding the enactment of § 334; however, the little there is does provide some insight into the purpose Congress intended it to serve. Although the House Report merely notes that "the consequences prescribed under § 334 reach results which . . . [effectuate] the principles of *Kimbell-Diamond*", H.R.Rep. No. 1337, 83rd Cong., 2d

Sess. (1954), 3 U.S.Code Cong. & Admin. News (1954) pp. 4017, 4247, the Senate Report is far more explicit:

> Paragraph (2) of subsection (b) incorporates into your committee bill *rules effectuating principles derived from Kimbell-Diamond Milling Co., supra.* [emphasis added]

S.Rep. 1622, 83rd Cong., 2d Sess. (1954), 3 U.S.Code Cong. & Admin.News (1954) pp. 4621, 4894. The report goes on to trace the details of those Code provisions that provide the substance of the "rules" designed to effectuate those principles: the result is that only those transactions meeting the requirements of § 334(b)(2) are entitled to *Kimbell-Diamond* treatment. The report reveals the clear intent of Congress to take the broad *Kimbell-Diamond* doctrine and mold it into a series of rules that provide a concise framework and procedure within which those principles would operate. *See* 3 U.S.Code Cong. & Admin.News (1954) at pp. 4894–4895. That this was the purpose behind § 334(b)(2)—to regulate the use of the cost-basis exception—has been the conclusion reached by every circuit court that has considered the issue.

The Ninth Circuit has flatly held that the *Kimbell-Diamond* philosophy "is no longer controlling" in situations involving liquidations to which § 334(b) applies. *Pacific Transport Company v. Commissioner*, 483 F.2d 209, 213 (9th Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974). The *Pacific Transport* court, adopting the reasoning of an earlier district court opinion, stated that the purpose of § 334(b)(2) was to eliminate the subjective intent test and replace it with a clear, objective standard against which a transaction could be measured; the intent of the taxpayer at the time the stock was acquired was no longer material. 483 F.2d at 213–214 citing *Boise Cascade Corp. v. United States*, 288 F.Supp. 770 (D.Idaho 1968), *aff'd per curiam*, 429 F.2d 426 (9th Cir. 1970).

The Fifth Circuit, although not specifically called on to decide this issue, has also expressed its opinion on the question:

> Section 334(b)(2) is a codification of principles derived from the decision in *Kimbell-Diamond Milling Co.* . . . [I]n codifying the *Kimbell-Diamond* rule Congress made a major change: it substituted a series of objective tests in place of a determination of the taxpayer's subjective intent to obtain corporation assets.

*Supreme Investment Corporation v. United States*, 468 F.2d 370, 377 (5th Cir. 1972).

Finally, in what this court believes is the most cogent and detailed opinion concerning the application of § 334(b)(2) to date, the Seventh Circuit has joined with the Ninth and the Fifth in rejecting the construction given § 334(b)(2) by the Court of Claims. *Broadview Lumber Company v. United States*, 561 F.2d 698 (7th Cir. 1977). The *Broadview* court held that the interpretation given § 334(b)(2) by the Court of Claims would render that section "superfluous." The court further noted that one of the primary purposes behind codification of the *Kimbell-Diamond* doctrine was to formulate guidelines that would obviate the need for litigation that is so often produced by a test that attempts to measure subjective intent and that, if codification is to achieve this goal, the statute must be mandatory and limited to its terms. The court then discussed the content of § 334(b)(2) and expressly held that, if the transaction in question cannot satisfy the definition of "purchase" outlined in § 334(b)(2), then the terms of § 334(b)(2) have not been met and "the basis of the assets obtained in liquidation is carried over instead of stepped-up." 561 F.2d 713.

This court holds that the *Kimbell-Diamond* doctrine has been supplanted by § 334(b)(2) and therefore applies only to those transactions that satisfy the requirements of that provision. Since the liquidation of the Page stock was not one that met those requirements, PIOI was not entitled to apply a stepped-up basis to the assets it received.

### III

The Plaintiff seeks an award of attorney's fees pursuant to the Civil Rights At-

torney's Fees Award Act of 1976, 42 U.S.C. § 1988. The relevant portion of the statute provides:

> . . . [I]n any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The Plaintiff has attempted to buttress its claim by charging that the Government has brought this appeal in bad faith solely for the purpose of "harassment." This court finds the Plaintiff's charges totally devoid of merit.

Under ordinary circumstances, the court would simply note that, since the Plaintiff is not the prevailing party in this appeal, it is not entitled to an award under the statute. This, unfortunately, is not the ordinary circumstance: the Plaintiff has made a serious allegation that lacks the slightest degree of support in either brief or in the record.[4] Although a showing of bad faith by the Government would aid the Plaintiff's cause, it can hardly be argued that the mere fact that an appeal has been filed—especially one that is permitted as a matter of right and is based on grounds that are certainly far from frivolous—constitutes, without more, even the slightest degree of bad faith, much less harassment. While the court does not in any way wish to discourage a party from seeking all forms of relief to which it may be entitled, no court can permit a party to cavalierly sprinkle its requests with unfounded allegations intended to seriously impugn the integrity of the opposing party. Charges of this nature will, in the future, either be supported by facts or else left unsaid. The Plaintiff's claim for an award of attorney's fees is denied.

---

**4.** The Plaintiff seems to believe that the Government is in bad faith because the basis on which it rests its claim for income taxes is a ground that has consistently been denied by all courts having occasion to consider it. This indicates that the Plaintiff's attorney either has not read the cases cited in the Government's

The judgment of the bankruptcy court is reversed, and this case is remanded to that court with instructions to allow the Government's claim for income taxes and to dismiss the Plaintiff's counterclaim for lack of jurisdiction.

brief or else has not understood them. There is no assertion of bad faith by the Government in appealing the bankruptcy court's decision to grant the Plaintiff's counterclaim; presumably this is because the Plaintiff's attorney is aware that the only case that is on all fours with the issue supports the Government's position.