**TEXAS FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**Glenn D. SEALOCK, Appellee.**

**No. 05–86–00577–CV.**

Court of Appeals of Texas, Dallas.

Aug. 24, 1987.

Rehearing Denied Oct. 19, 1987.

Robert W. Coleman, John E. Richards, Robert B. Payne, Dallas, for appellant.

Frank E. McLain, Bill Reed, Dallas, for appellee.

Before WHITHAM, McCLUNG and McCRAW, JJ.

WHITHAM, Justice.

The appellee-employee, Glenn D. Sealock, and the appellant-employer, Texas Federal Savings & Loan Association, had a written employment agreement. The agreement contained a "golden parachute" provision. The term "golden parachute" refers generally to agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership. *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1 (1985). A corporate reorganization pertaining to Texas Federal occurred. Texas Federal refers to that transaction as a "reverse triangular merger." We will use the same description. The principal issue is whether the reverse triangular merger triggered the golden parachute provision. The trial court rendered judgment in favor of Sealock awarding recovery of contractual liquidated damages under the golden parachute provision. We conclude that the reverse triangular merger did not trigger the golden parachute provision for liquidated damages in Sealock's employment agreement. Thus, Sealock's parachute never opened. Accordingly, we reverse and render a take-nothing judgment against Sealock.

### Sealock's Paragraph 6(b) Claim

■ On July 27, 1981, Sealock, as employee, and Texas Federal, as employer, made a written contract. The pertinent parts of Sealock's employment agreement are as follows:

1. *Term*

This Agreement shall be for a term of two (2) years, to commence immediately upon Texas Federal's receipt of its charter S as as [sic] capital stock savings and loan association; provided, however, that should such charter not be granted prior

to September 1, 1981, then this Agreement shall become null and void upon such date, and be of no force or effect. The term shall automatically renew from year to year, and shall be terminable by either party at the expiration of the original or any renewal term upon the giving of six (6) months prior written notice of such intention to the other party, or as otherwise provided herein.

\*     \*     \*     \*     \*     \*

### 5. *Compensation for services*

In consideration for the services to be performed by the Employee, Texas Federal agrees to pay to the Employee an annual salary of $61,000 which shall be subject to increment from time to time as the Board of Directors of Texas Federal, in its sole discretion may determine. In addition, the Employee shall be reimbursed for any actual travel and other business expenses necessarily incurred by the Employee in the performance of his duties hereunder. The Employee shall receive such additional compensation in the form of fringe benefits, such as, insurance, pension, bonus, stock options, etc. as the Board of Directors of Texas Federal in its sole discretion may from time to time determine. As used herein, the term "total annual compensation" means the aggregate of the Employee's annual salary and fringe benefits provided to the Employee by Texas Federal as additional compensation.

\*     \*     \*     \*     \*     \*

### 6. *Termination*

a. In the event that the Employee shall breach or violate any term or condition of this Agreement, Texas Federal may thereupon terminate his employment consistent with the then current employment and termination of employment practices of Texas Federal; but in no event shall the effective date of termination by [sic] earlier then [sic] ten (10) days after written notification of the date of discharge by the Association to the employee.

b. If, during the term of this contract, ownership of 10 percent (10%) or more of the outstanding voting securities of Texas Federal become vested in any person or group of persons acting in concert and subsequent to the vesting of such ownership Texas Federal terminates the employment of Employee, for any reason other than theft, or commission of a felony in the course of employment. The parties contemplate that the damages resulting to the Employee from such determination will be difficult to ascertain. Accordingly, in such circumstances, Texas Federal agrees to pay to the Employee, as liquidated damages and not as penalty, an amount equal to twice the Employee's then total annual compensation; that amount of compensation is mutually determined to be reasonable by the parties.

(For clarity, we conclude that the first two sentences of paragraph 6(b) must be read as the following one sentence: "If during the term of this contract, ownership of 10 percent (10%) or more of the outstanding voting securities of Texas Federal become vested in any person or group of persons acting in concert and subsequent to the vesting of such ownership Texas Federal terminates the employment of Employee, for any reason other than theft, or commission of a felony in the course of employment[,] [t]he parties contemplate that the damages resulting to the Employee from such [ ]termination will be difficult to ascertain.") Paragraph 6(b) is the golden parachute provision at issue.

We will describe the reverse triangular merger in more detail later. For now, know that during the spring of 1983, a holding company, Texas Federal Financial Corporation (TFFC), was organized by the directors and officers of Texas Federal as a Delaware corporation. In the transaction, a newly created second savings and loan association, which was a subsidiary of TFFC, was to merge into Texas Federal and thereby the "resulting association" was to become a wholly owned subsidiary of the holding company. Other than estab-

lish the holding company, however, the merger was not to result in any change of management or control at Texas Federal. During the summer months of 1983, the necessary steps to set up TFFC as a holding company for Texas Federal were complete. On September 8, 1983, all governmental approvals had been obtained and the merger (the "September 8 merger") became effective so that the "Resulting Association" (named Texas Federal Savings & Loan Association) formed by the merger of the TFFC subsidiary into Texas Federal became a subsidiary of TFFC. Hence, our use of the name "Texas Federal" for periods after September 8, 1983, is not intended to suggest that the "Resulting Association" called "Texas Federal" is one and the same as the entity called "Texas Federal" prior to September 8, 1983. Upon the merger becoming effective, *all* outstanding shares of stock (*i.e.*, the voting securities) of Texas Federal became and were converted, by the express language of the merger agreement and by operation of law and without any action on the part of the stockholder, into the right to receive shares of TFFC on a share for share basis. Following the merger, Texas Federal's common stock ceased to be authorized to be quoted on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") and the registration of the stock under the Securities Exchange Act of 1934 was terminated. TFFC stock was thereafter so quoted and registered. In short, as of September 8, 1983, *all* outstanding voting securities of Texas Federal ceased to exist as such and were instead considered by operation of law to be the equivalent of shares of TFFC stock. Sealock was discharged by Texas Federal on September 19, 1983, eleven days after the September 8 merger.

Although a jury case, the trial court did not submit to the jury any issue or issues bearing on whether the September 8 merger triggered the liquidated damages provi-

sion in paragraph 6(b). Instead, the trial court treated the question of whether the September 8 merger triggered the liquidated damages provision in paragraph 6(b) as a question of law. Hence, in its judgment, the trial court found:

> Further, the Court is of the opinion that the September 8, 1983 merger between [Texas Federal] and [TFFC's] wholly-owned subsidiary constituted, under 6(b), a "vesting" of the entire ownership of [Texas Federal] in [TFFC], as a matter of law.

Thus, the trial court determined that, as a matter of law, the reverse triangular merger triggered the golden parachute provisions for liquidated damages in paragraph 6(b) in Sealock's employment contract and assessed damages based on the jury's damage awards.[1] In this connection, we note that at oral argument both parties conceded that Sealock's employment agreement was unambiguous. Furthermore, we note that the facts regarding the reverse triangular merger transaction are undisputed. Therefore, we reach the question of whether the trial court correctly determined that the September 8 merger between Texas Federal and TFFC's wholly-owned subsidiary constituted, under paragraph 6(b), a vesting of the entire ownership of Texas Federal in TFFC, as a matter of law.

In its first two points of error, Texas Federal contends that the trial court erred in overruling its motion for judgment and motion for new trial (1) because, as a matter of law, the undisputed evidence establishes that Sealock was not entitled to recover under Paragraph 6(b) of the employment agreement in that there was no vesting of the ownership of ten percent or more of Texas Federal's outstanding voting securities in any person or group prior to Sealock's termination, as required by Paragraph 6(b); and (2) because there is no evidence to establish that the ownership of

---

1. In light of our disposition of the case, we need not reach Texas Federal's challenge to the dam- ages assessed by the trial court.

ten percent or more of Texas Federal's outstanding voting securities vested in any person or group prior to Sealock's termination. We agree. At trial, in order to prevail on his claim, Sealock had the burden of proving that paragraph 6(b) was triggered and became operative; that is, that *"ownership* of 10 percent (10%) or more of the *outstanding voting securities* of Texas Federal [became] vested in any person or group of persons," (emphasis added) prior to his discharge. We conclude that Sealock failed in his burden. We reach this conclusion for the reason that the shares of the old Texas Federal existing prior to the September 8 merger disappeared in the reverse triangular merger. Therefore, being non-existent, we reason that the "outstanding voting securities of Texas Federal" could never be vested in "any person or group of persons acting in concert."

The facts regarding the reverse triangular merger are undisputed. We now provide a more detailed description of the transaction. On April 25, 1983, Texas Federal entered into the merger agreement with TFFC and its subsidiary. On April 26, 1983, Texas Federal issued its Notice of Annual Meeting of Stockholders and Proxy Statement seeking approval of the proposed merger and new holding company. Sealock was a stockholder at this time. On May 2, 1983, Sealock executed his copy of the proxy statement. On May 4, 1983, Texas Federal received Sealock's executed proxy allowing his shares to be voted in favor of the merger. The proxy statement made clear that there would be no change in the control of Texas Federal as a result of the merger. The merger of Texas Federal and the newly formed subsidiary of TFFC would create a surviving savings and loan association (the "Resulting Association"), which Resulting Association would have the name "Texas Federal Savings & Loan Association," and "will continue the operations of the Association *at the same locations, with the same management,* and *with all of the rights, obligations, and liabilities of the Association immediately*

*prior to the Merger."* (Emphasis added.) "The present directors of the Association will become the directors of the *Resulting Association,* and the present officers of the Association will become the officers of the *Resulting Association,* each serving in the position or positions he or she now holds with the Association." (Emphasis added.) On May 17, 1983, at the stockholders' meeting, the merger was approved by the stockholders and no stockholder exercised any dissenter's rights.

The purpose of the merger was to establish TFFC as a savings and loan holding company. The merger agreement identifies four separate entities, either "associations" or "corporations". The entity referred to as "Employer" in Sealock's employment agreement was known as "Texas Federal Savings & Loan Association". This first entity was identified in the merger agreement as the "Existing Association." At the time the merger agreement was signed, Texas Federal—the Existing Association—had previously caused to be issued 1,500,000 shares of common stock and 100,000 shares of preferred stock. The public owned such "outstanding" shares. These shares of stock were referred to in Sealock's employment agreement as the "outstanding voting securities of Texas Federal."

The second entity mentioned in the merger agreement was TFFC, referred to as "the Corporation". TFFC was organized as a Delaware corporation on April 6, 1983. Prior to the merger, TFFC had no outstanding shares of stock and no capital. However, it did have sufficient authorized common and preferred stock to issue to the shareholders of Texas Federal—the Existing Association—exactly the same number of shares of TFFC stock as those shareholders owned of the Existing Association upon the merger becoming effective.

The third entity identified in the merger agreement, New Texas Federal Savings & Loan Association (the "Other Association"), was also a new corporation chartered shortly prior to the merger. Immediately

prior to the merger, the Other Association had issued all of its 1,000 shares of common stock to TFFC for $1,000.00. Thus, immediately prior to the merger, the Other Association was already the wholly owned subsidiary of TFFC. As in the case of the Existing Association, the Other Association lost its separate identity as a result of the merger.

The fourth and last entity referred to in the merger agreement was actually created by the merger. That entity was known as the "Resulting Association." Pursuant to certain provisions of Federal Law (12 C.F.R. § 552.13 (1987)), on the effective date of the merger, New Texas Federal was merged with and into Texas Federal— the Existing Association—to form the "Resulting Association." The Resulting Association, bore the same name, "Texas Federal Savings & Loan Association," as the Existing Association had borne prior to the merger. All of the assets, properties and liabilities of *both* the Existing Association and the New Texas Federal became the assets and properties of the Resulting Association.

Pursuant to the express terms of the merger agreement *"all outstanding shares* of [Texas Federal] Common and [Texas Federal] Preferred Stock shall by operation of law ... become and be converted into the right to receive ... one share of [TFFC] Common Stock for each share of [Texas Federal] Common Stock ... [and] one share of [TFFC] Preferred Stock...." (Emphasis added.) Pursuant to the merger, the holders of the outstanding securities of Texas Federal—the Existing Association—were to maintain the same percentage ownership in TFFC as they held in Texas Federal, since their stock was converted on a share-for-share basis. Subsequent to the merger, the directors, officers and members of committees of Texas Federal—the Existing Association—became the directors, officers and committee members of the Resulting Association.

Therefore, we conclude that the ownership of ten percent or more of the "out-standing voting securities" of Texas Federal did not become, and could not have become, vested in anyone else, including TFFC, through the merger because the ownership of 100 percent of such securities was required by operation of law *to become and be converted into* stock of TFFC. Thus, TFFC did not become "vested" with the ownership of any of the "outstanding voting securities" of Texas Federal. Furthermore, there was no change in the control of Texas Federal. The merger resulted in the formation of TFFC as a holding company which by operation of law was owned by the very same shareholders as owned Texas Federal. Hence, TFFC never owned any of the outstanding voting securities of the employer identified in Sealock's employment agreement. As pointed out above, Sealock was the owner of Texas Federal stock prior to the merger. By the express terms of the merger agreement and by operation of law, the ownership of his own stock—and the ownership of the stock held by the other stockholders—became "converted into" the right to receive stock of TFFC. The only stock TFFC ever owned before or after the September 8 merger was the 1000 shares of stock of its subsidiary, the newly chartered association called New Texas Federal in the merger agreement. Its ownership never increased. Instead, the stockholders of Texas Federal became the stockholders of TFFC, each holding the same number of shares before and after the merger.

In light of the facts surrounding the September 8 merger, we conclude that the trial court erred in finding that paragraph 6(b) was triggered by this transaction. Therefore, we decline to hold that the ownership of old Texas Federal became vested in TFFC as a result of the September 8 merger. Consequently, we conclude that Sealock did not have a claim under paragraph 6(b), either in form or in substance. Construing paragraph 6(b) strictly, as we must, it follows, and we so hold, that Texas Federal was entitled to judgment as a matter of law. We sustain Texas Federal's first two points of error.

*Sealock's Paragraph 6(a) Claim*

In the trial court, Sealock sought recovery on alternative theories: one seeking contractual liquidated damages under the golden parachute provision in paragraph 6(b); the second seeking damages for wrongful termination of employment covered by paragraph 6(a). The trial court's judgment awarded Sealock recovery solely on the basis of his golden parachute claim under paragraph 6(b) and denies all other relief. In the trial court's language in its judgment: "All relief not expressly granted herein is expressly DENIED." In order that there be no misunderstanding concerning the basis of the trial court's judgment, we quote the trial court's judgment omitting only the formal introduction and recitation of the jury's findings:

After reviewing the jury's findings in the presence of the jury and before all parties and their attorneys of record, the Court polled the jury en masse. Each party was also given the opportunity to further "poll" the jury, but declined. Thereafter, the jury's verdict was "accepted" by the Court.

Based upon the jury's answers to the foregoing Special Issues, the Court is of the opinion that the Plaintiff has established every element necessary to recover under Paragraph 6(b) of the Plaintiff's Employment Agreement.

Further, the Court is of the opinion that the September 8, 1983 merger between Texas Federal Savings and Loan Association and Texas Federal Financial Corporation's wholly-owned subsidiary constituted, under 6(b), a "vesting" of the entire ownership of Texas Federal Savings and Loan Association in Texas Federal Financial Corporation, as a matter of law.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Plaintiff shall have and recover from Defendant the sum of Seven Hundred Ninety Thousand Dollars ($790,000.00), together with prejudgment interest at the rate of ten percent (10%) from July 27, 1984, until the date of this JUDGMENT, together with postjudgment interest at the rate of ten percent (10%) per annum from the date of this Judgment until all amounts granted hereunder are fully paid, plus the sum of One Hundred Seventeen Thousand Dollars ($117,000.00) which the Court deems (and the jury has found) to be a reasonable and necessary attorney's fee in this cause. However, in the event that no appeal is taken from this Judgment by Defendant, Plaintiff shall remit the sum of $32,000 to Defendant as a credit upon such attorneys' fees and, provided further, that in the event Defendant shall (unsuccessfully) appeal this case to the Court of Appeals but thereafter elect not to apply for a writ of error to the Supreme Court of Texas, Plaintiff shall remit the sum of $10,-000.00 as a credit upon such attorney's fees. All costs of court are taxed against the Defendant. Plaintiff shall also be entitled to all writs and processes necessary for the enforcement and collection of this Judgment.

All relief not expressly granted herein is expressly DENIED.

Thus, there can be no doubt that the trial court awarded Sealock recovery solely on the basis of his golden parachute claim under paragraph 6(b) and denied all other relief. Hence, the trial court denied Sealock recovery for wrongful termination of employment under paragraph 6(a).

Nevertheless, on appeal Texas Federal tells us its reasons why Sealock should not recover under paragraph 6(a). As appellant, Texas Federal advances eleven alternative points of error challenging Sealock's right to recover under paragraph 6(a). As appellee, Sealock responds to Texas Federal's eleven alternative points of error in five alternative reply points. Nowhere, however, does Sealock complain on appeal of the trial court's denial of recovery for wrongful termination of employment under paragraph 6(a). Instead, in his brief, Sealock presents the unnumbered statement: "Wrongful Termination Claim and Jury's

Verdict (Sealock's alternate theory of recovery)." In his argument under this statement, Sealock asserts that "if Sealock's 6(b) judgment is set aside for any reason, then this court can render judgment based upon Sealock's wrongful discharge theory upon the facts proven and the jury's answers to the remaining special issues." For the purposes of this opinion, we assume, but do not decide, that Sealock's statement is a cross-point of error. For the purposes of this opinion, we further assume, but do not decide, that Sealock was not required to file an appeal or cost bond in order to present this cross-point of error. Nevertheless, we conclude that we cannot render judgment for Sealock based upon his wrongful discharge claim under paragraph 6(a). We reach this conclusion because Sealock failed to pray that we render judgment based upon his wrongful discharge claim. We quote Sealock's prayer:

> The evidence supports the jury's findings that Sealock was terminated after the September 8, 1983 merger of Texas Federal with another entity. The trial court correctly ruled, as a matter of law, that the September 8, 1983 merger constituted a triggering event under paragraph 6(b) of Sealock's Employment Contract, entitling Sealock to recover twice the amount of his total annual compensation.
>
> Alternatively, the record demonstrates ample support for the jury's determination that Sealock was fired without cause *and* that Texas Federal was not honestly dissatisfied with Sealock's job performance at the time of his termination, and that he suffered actual damages of at least $165,871.00 by virtue of the wrongful termination.
>
> For the reasons stated herein, Appellee Glenn Sealock respectfully submits that *the findings by the jury and the trial court are in all ways correct; that the judgment entered by said court was proper;* that Texas Federal has failed to show harmful error; *and that the judgment below should be affirmed.* In addition, Sealock respectfully requests this Court to grant such other and further relief to which he has shown himself entitled.

(Emphasis added). Nothing is better established than the proposition that relief that has not been prayed for on appeal cannot be granted. *See West End API. LTD. v. Rothpletz,* 732 S.W.2d 371, 374 (Tex.App.—Dallas, 1987, writ ref'd n.r.e.). The nature of relief sought on appeal should be clearly stated. TEX.R.APP.P. 74(g). In the present case, Sealock only prays that the trial court's judgment be affirmed. He does not pray that judgment be rendered for him on his wrongful discharge claim under paragraph 6(a). Accordingly we conclude that we cannot render judgment for Sealock on his wrongful discharge claim. We overrule Sealock's assumed cross-point of error.

### Disposition

We have sustained Texas Federal's first two points of error. We have overruled Sealock's assumed cross-point of error. Therefore, we must reverse the trial court's judgment and render a take-nothing judgment against Sealock. Accordingly, we reverse the trial court's judgment and render judgment that Sealock take nothing against Texas Federal.

McCRAW, J., dissents.

McCRAW, Justice, dissenting.

I respectfully dissent. The majority has adopted, without analysis and without the citation of authority, the Association's argument that stock did a Houdini-like disappearance as a matter of law. I cannot agree that on September 8, 1983, all the outstanding voting stock of the Association "ceased to exist" by operation of law, thereby causing Sealock's contractual rights also to disappear. I would hold that 100% of the stock was simply transferred and exchanged for 100% of the Delaware holding company stock by a complex reverse triangular merger. As a result of this legal triple shuffle, the holding compa-

ny, a Delaware corporation, and its controlling Board of Directors, was superimposed over the old Association, a Texas corporation. I would hold that a "group of persons acting in concert" accomplished this 100% stock transfer, that the stock vested in them, and that, therefore, the reverse triangular merger prepared the golden parachute for activation and that Sealock's termination eight days after the merger triggered this clause. I would affirm the trial court's judgment on this issue.

### Activating the Golden Parachute

In its first three points of error, the Association contends that the trial court erred in rendering judgment on the golden parachute clause because the triggering event did not occur prior to Sealock's termination. On September 8, 1983, the Association became the wholly-owned subsidiary of Texas Federal Corporation (TFFC), a Delaware bank holding company, by utilizing a reorganization technique known as a reverse triangular merger. Sealock's employment was terminated on September 19, 1983. The question before this Court is whether this reverse triangular merger activated the golden parachute clause by causing "ownership of 10 percent (10%) or more of the outstanding voting securities of Texas Federal [to] become vested in any person or group of persons acting in concert." To answer this question, I will explore the nature of a reverse triangular merger. There is a dearth of legal authority, but a wealth of commentary on this subject.

A triangular merger refers to a merger in which a subsidiary of an acquiring corporation is the surviving corporation in a merger with a target corporation. In a reverse triangular merger, the subsidiary is merged into the target corporation with that resulting corporation becoming a subsidiary of the acquiring corporation. Garret, *Merger Meets the Common Law*, 63 TEXAS L.REV. 1509, 1511 n. 8 (1985); Ginnings & Jones, *Triangular Mergers in Texas*, 12 HOUS.L.REV. 307, 309 (1975). The

target corporation, like the Association in this case, survives the merger. A reverse triangular merger, rather than a forward triangular merger, is utilized when regulatory requirements necessitate the preservation of the existing corporate identity of the target. Reverse triangular mergers are, therefore, commonly used in acquisitions involving banks, insurance companies, public utilities and other regulated industries. Beller, *Final Regulations Ease Planning For Tax–Free Reverse Subsidiary Mergers*, 64 J.TAX'N 80 (1986). "In order to understand why competent counsel would ever direct such convoluted choreography, one must examine the tune to which his clients dance, the reorganization provisions of the Internal Revenue Code." Ginnings & Jones, 12 HOUS.L.REV. at 309.

Reverse triangular mergers are creations of the Federal tax laws. The Internal Revenue Code establishes guidelines for corporate reorganizations which may be accomplished without adverse tax consequences for the shareholders and for the corporate parties to the reorganization. Reverse triangular mergers can be structured to fulfil the requirements of several code provisions that provide for tax-free results. *See, e.g.,* 26 U.S.C.A. §§ 351(a), 368(a)(1)(B), 368(a)(2)(E) (West Supp.1987); Rev.Rul. 74–564, 1974–2 C.B. 124; Rev.Rul. 67–448, 1967–2 C.B. 144. The common element in these provisions is the exchange of stock. The shareholders of the target corporation must exchange target stock for stock of the acquiring parent corporation.

According to the Notice of Annual Meeting of Stockholders of the Association, which describes the reverse triangular merger, the Association contemplated an exchange of Association Common Stock and Preferred Stock for Common Stock and Preferred Stock of TFFC:

At the effective date of the Merger, without any further action on the part of the Association's stockholders, each share of Association Common Stock shall be changed and converted into one share of Corporation Common Stock and each

share of Association Preferred Stock shall be changed and converted into one share of Corporation Preferred Stock. Each certificate previously representing shares of Association Common Stock held by stockholders (other than those who perfect their dissenters' rights, if any) shall represent the right to receive an equivalent number of shares of Corporation Common Stock, and certificates previously representing shares of Association Preferred Stock will represent the right to receive an equivalent number of shares of Corporation Preferred Stock.

\* \* \* \* \* \*

As soon as practicable after the effective date of the Merger, transmittal forms will be mailed to each holder of record of certificates formerly representing shares of Association Common Stock to be used in forwarding their certificates for surrender and exchange for certificates representing Corporation Common Stock. After receipt of such transmittal form, each holder of certificates formerly representing Association Stock should surrender the same, and each such holder will receive in exchange therefor certificates representing the equivalent number of shares of Corporation Common Stock.

It was undisputed at trial that the merger occurred as planned, and that all Association shareholders exchanged their voting stock for TFFC voting stock. It is also undisputed on appeal that Sealock was terminated after the reverse triangular merger occurred. The only remaining dispute, then, is whether the exchange of 100 percent of the voting stock of the Association for 100 percent of the voting stock of TFFC constitutes the vesting of ownership of ten percent or more of the outstanding voting securities of the Association. I would hold that it does.

The Association argues, and the majority accepts, that no stock vested in TFFC or any other person, because instantaneous with the merger all outstanding voting securities of the Association ceased to exist and were instead considered by operation of law to be the equivalent of shares of TFFC stock. The majority cites no authority for this disappearance. The Association also cites no authority, but appears to rely upon its interpretation of Federal tax law. Such reliance is misplaced.

The tax laws speak in terms of the exchange or transfer of stock. *See* 26 U.S.C.A. §§ 351(a), 368(a)(1)(B), 368(a)(2)(E) (West Supp.1987). The Notice of Stockholder's Annual Meeting indicates that the Association contemplated a reverse triangular merger constituting a tax-free transaction in compliance with section 351(a) of the Internal Revenue Code which provides: "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation." 26 U.S.C.A. § 351(a) (West Supp.1987). Stock constitutes "property" within the meaning of this provision. *Chrome Plate, Inc. v. District Director of Internal Revenue*, 442 F.Supp. 1023, 1027 (W.D.Tex.1977). The Association, according to the notice of shareholders, contemplated the transfer of Association stock to TFFC in exchange for TFFC stock.

"Transfer" and "exchange" are not defined by the Internal Revenue Code. Texas courts have long given these terms their common meaning. *See, e.g., Hoovel v. State*, 125 Tex.Cr.R. 545, 69 S.W.2d 104, 108 (1934); *Hayter v. Fern Lake Fishing Club*, 318 S.W.2d 912, 915 (Tex.Civ.App.— Beaumont 1958, no writ); *Ditto Investment Co. v. Ditto*, 302 S.W.2d 692, 694 (Tex.Civ.App.—Fort Worth 1957), *rev'd on other grounds*, 309 S.W.2d 219 (Tex.1958). Exchange is defined in common usage as "the act of giving or taking one thing in return for another as if equivalent: as ... the process of reciprocal transfer of ownership." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 792 (Unabridged) (1981). Transfer is defined as "the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift or other process." *Id.* at 2427.

Transfer and exchange, by their very definitions, encompass the conveyance of an ownership interest in property to another. Neither the Association nor the majority have cited authority for the metaphysical explanation that the stock disappeared rather than vested in TFFC. According to the evidence in this case, all Association shareholders transferred 100 percent of their stock in the Association to TFFC in exchange for TFFC stock. I would hold that the reverse triangular merger in this case activated Sealock's golden parachute clause in that the ownership of ten percent or more of the outstanding voting securities of the Association vested in any person or persons acting in concert prior to Sealock's termination. Points of error one, two and three should be overruled. In so holding, I must address the remaining points of error.

### Ambiguity of the Golden Parachute Clause

In points of error four, five and six, the Association contends that the golden parachute clause is ambiguous, that the parties never intended paragraph 6(b) to apply to anything other than hostile takeovers, and that intent is manifested in the use of the term "golden parachute" at trial. At oral argument before this Court, the Association conceded that the clause is unambiguous. I agree, and would hold that the clause is unambiguous. If a written contract is so worded that it can be given a certain or definite meaning or interpretation, it is not ambiguous. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1982). The golden parachute clause clearly states that Sealock is entitled to damages if he is terminated after ownership of ten percent or more of the outstanding voting securities of the Association becomes vested in any person or persons acting in concert. This language is certain and definite. The only question in this case is whether the reverse triangular merger caused stock to vest in any person.

The Association argues further that the parties never intended paragraph 6(b) to apply to anything other than hostile takeovers, and that intent is manifested in the use of the term "golden parachute" clause. When a contract is unambiguous, the courts will not look to the subjective intent of the parties; instead, the courts seek the objective intent of the parties as expressed in the contract. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982). This Court may not look outside the contract to ascertain the intent of the parties. *Cherokee Water Co.*, 641 S.W.2d at 524; *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex.1981).

I am not persuaded that by using the term "golden parachute" at trial the parties manifested an intent that paragraph 6(b) apply only to hostile takeovers. The term merely refers generally to agreements between a corporation and its top officers which guarantees certain benefits in the event of a change of corporate ownership. *See Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1 (1985). The change in control which triggers the clause can be defined in a number of ways, not all of which are consistent with hostile takeovers. *See* ABA Subcommittee on Executive Compensation, *Executive Compensation: A Road Map for the Corporate Advisor*, 40 BUS.LAW. 219, 350 (1985). I would overrule appellant's fourth, fifth and sixth points of error.

### Enforceability of Golden Parachute Clause

In its seventh point of error, the Association avers that the golden parachute clause is a penalty provision which is unenforceable. The Association argues that golden parachute provisions should be assessed according to the law governing liquidated damage provisions. "Liquidated damages" constitute the measure of damages agreed to in advance by the parties as just compensation for the breach of a contract where the harm caused by the breach is difficult to estimate accurately. *Sisk v. Parker*, 469 S.W.2d 727, 733 (Tex.Civ.App.—Amaril-

lo 1971, writ ref'd n.r.e.). I would hold that the correct standard of review of golden parachute provisions is that applicable to liquidated damage provisions. *See Koenings v. Josephs Schlitz Brewing Co.*, 126 Wis.2d 349, 377 N.W.2d 593, 599 (1985) (golden parachute clause treated as stipulated damage provision).

A liquidated damage provision is not enforceable unless the amount stipulated is a reasonable forecast of just compensation for the harm caused by the breach of contract, and that harm is incapable or very difficult of accurate estimation. *See Henshaw v. Kroenecke*, 656 S.W.2d 416, 419 (Tex.1983); *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 (Tex.1979); *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952). The court should examine the terms of the contract, construed in light of the subject matter, the character of the transaction, the situation of the parties, the certainty or uncertainty of showing the amount of actual damages sustained, and the ease or difficulty with which proof of such actual damages can be made. *See White v. Wilbanks*, 144 S.W.2d 941, 942–43 (Tex.Civ.App.—Amarillo 1940, no writ). This Court must consider the circumstances at the time the employment agreement was executed. *Schepps v. American District Telegraph Co.*, 286 S.W.2d 684, 690. (Tex.Civ.App.—Dallas 1955, no writ). "The viewpoint of the parties at the time when the contract was made, and not the situation which is shown to have existed when it was breached, is to be considered in determining the issue as to reasonableness of the stipulation or certainty as to actual damages." *Id.*

The golden parachute clause in Sealock's employment contract provides:

> The parties contemplate that the damages resulting to the Employee from such determination will be difficult to ascertain. Accordingly, in such circumstances, Texas Federal agrees to pay to the Employee, as liquidated damages and not as penalty, an amount equal to twice the Employee's then total annual com-

pensation, that amount of compensation is mutually determined to be reasonable by the parties.

In determining whether this provision is enforceable as liquidated damages or unenforceable as a penalty, a reviewing court is not bound by the language of the parties that the clause is reasonable and not a penalty. *Stewart*, 245 S.W.2d at 486. Instead, the Court must examine the surrounding circumstances. *Stewart*, 245 S.W.2d at 486; *Zucht v. Stewart Title Guaranty Co.*, 207 S.W.2d 414, 418 (Tex. Civ.App.—San Antonio 1948, writ dism'd).

I first examine the facts of this case to determine whether the amount stipulated is a reasonable forecast of just compensation for the harm caused by the breach. *Henshaw*, 656 S.W.2d at 419. The disputed clause provides that in the event Sealock is terminated, he will receive twice his then total annual compensation. The contract, signed July 27, 1981, was for a two-year term, to be automatically renewed from year to year. At the time the contract was signed, the parties could not know the specific time when the golden parachute clause would be activated, nor could they know whether Sealock would be able to find comparable employment on that date. An amount equal to twice his annual compensation would, therefore, be a reasonable forecast of just compensation for Sealock's termination.

The Association contends that the amount is unreasonable because there is no requirement that Sealock mitigate his damages by finding employment. I disagree, and would hold that the stipulated amount is a reasonable forecast of damages. Where there exists a valid liquidated damages clause, the court will not consider the issue of mitigation. *Shasteen v. Mid–Continent Refrigerator Co.*, 517 S.W.2d 437, 440 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.); *Nautilus Training Center No. 2, Inc. v. Seafirst Leasing Corp.*, 647 S.W.2d 344, 347 (Tex.App.—Corpus Christi 1982, no writ). Additionally, the Association argues that the amount is unreasonable be-

cause it bears no relation to the actual damages suffered by Sealock. The Association has made no reference to any part of the record wherein it proved Sealock's actual damages. The party arguing that a stipulated amount is unrelated to actual damages has the burden of proving actual damages. *Johnson Engineers v. Tri–Water Supply Corp.*, 582 S.W.2d 555, 557 (Tex.Civ.App.—Texarkana 1979, no writ); *Oetting v. Flake Uniform & Linen Service*, 553 S.W.2d 793, 795 (Tex.Civ.App.—Fort Worth 1977, no writ); *Southern Plow Co. v. Dunlap Hardware Co.*, 236 S.W. 765, 766 (Tex.Civ.App.—Dallas 1922, no writ).

I now consider whether the damages were incapable or difficult of accurate estimation. *Stewart*, 245 S.W.2d at 486. The Association contends, of course, that the liquidated damage clause fails this prong of the test because the amount of actual damages is capable of accurate determination without difficulty. Sealock's total annual compensation was contingent upon a number of future events. Paragraph five of his employment agreement states that in addition to his annual salary, Sealock was to receive fringe benefits, including bonuses and stock options, "as the Board of Directors ... in its sole discretion may from time to time determine." The golden parachute clause fixed the damages at twice Sealock's then annual compensation. I would hold that the damages flowing from a breach of this employment contract would be very difficult to estimate accurately; therefore, the second prong of the test enunciated by *Stewart v. Basey* has been met. The golden parachute clause is enforceable as a liquidated damage provision. Point of error seven should be overruled.

### Sealock's Annual Compensation

In points of error eight, nine, ten and eleven, the Association contends that the special issue asking the jury to determine Sealock's annual compensation was fatally defective in that it allowed consideration of events affecting fringe benefits occurring after the date of Sealock's termination, and that the evidence is legally and factually insufficient to support the jury's verdict. I agree. The golden parachute clause set Sealock's damages at twice his "then total annual compensation."

Nine months after the execution of Sealock's employment agreement, the Association and Sealock entered into a stock option agreement. The agreement established the employee's right to purchase Association stock in specified amounts and at designated times. The option agreement was for a five year term, but provided for expiration of unexercised options at the time the employee's employment was terminated for any reason other than retirement or death.

Sealock's employment was terminated on September 19, 1983. Sealock presented evidence that if his employment had continued, he would have been able to exercise stock options in 1984, 1985 and 1986 to acquire 6,000 shares of Association stock. Further, the 20% stock dividend announced by the Association in December 1983 would have resulted in an additional 1,200 shares. In December 1984, Bright Banc purchased the Association and offered $44.00 per share for all stock options, regardless of the date on which they were exercisable. By multiplying 7,200 shares by $44.00, and subtracting the option price of $46,500.00, Sealock arrived at the figure of $270,300.00 as his option benefits lost because of his termination. The jury was allowed to consider these amounts, based upon events occurring within the term of the employment agreement, but after Sealock's termination, in determining Sealock's annual compensation.

Sealock also offered evidence that he was entitled to pension benefits of $30,000 in addition to the annual pension contribution made by the Association. In December 1983, approximately three months after Sealock's termination, the Association discontinued its pension plan. All current employees received vested pension rights at that time. If Sealock had been an employ-

ee at that time, he would have received vested pension rights in the amount of $30,000.00. The jury was allowed to consider this amount in arriving at an amount representing Sealock's annual compensation.

Sealock also offered the following evidence of his annual compensation at the time he was discharged: (1) salary of $71,208.00; (2) bonus of $10,000.00; (3) country club membership dues amounting to $2,400.00; (4) health and life insurance premiums paid by the Association in the amount of $1,274.00; (5) medical reimbursement payments of $2,233.00; and (6) automobile privileges amounting to $8,400.00. The Association did not dispute this evidence. These items total $94,587.00. The jury found $395,000.00 to be Sealock's total annual compensation.

I agree with the Association that the special issue should have limited the jury's consideration to evidence of Sealock's annual compensation at the time he was fired. The contract provision relied upon by Sealock specifically fixes his damages at twice his *then* annual compensation. The clause could only refer to his compensation at the time Sealock's employment terminated. The termination paragraph makes no mention of future contingent fringe benefits surviving Sealock's termination. Nor can such be drafted by judicial process. *See Royal Indemnity Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965); *General American Indemnity Co. v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *Anderson v. Badger,* 693 S.W.2d 645, 647 (Tex.App.—Dallas, 1985, no writ). At the time of his termination, September 19, 1983, Sealock's vested then annual compensation was $94,587.00. He is entitled to twice that amount—$189,174.00—as liquidated damages under the golden parachute provision. I would, therefore, modify the judgment of the trial court and render such judgment against the Association, as authorized by TEX.R.APP.P. 82, predicated upon the undisputed evidence of Sealock's annual compensation and existing fringe benefits on his termination date, in the amount of $189,174.00.

### Prejudgment Interest

In points of error twelve and thirteen, the Association contends that the trial court erred in awarding prejudgment interest because the damages are punitive in character, being "assessed over and above the amount of damages necessary to indemnify the plaintiff." *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 556 (Tex.1985). Having held the liquidated damage provision to be a reasonable forecast of Sealock's actual damages and, therefore, enforceable, I would overrule this contention. The Association argues in the alternative that the trial court erred in awarding prejudgment interest upon $790,000.00, because the amount provided for in the liquidated damage clause is a lesser amount. I agree. The cause should be remanded for recalculation of prejudgment interest on $189,174.00 in accordance with TEX.REV.CIV.STAT.ANN. art. 5069–1.05 (Vernon 1987).

### Attorney's Fees

In point of error fourteen, the Association contends that the amount of attorney's fees found by the jury was disproportionate to any recovery the court could have awarded Sealock. The jury found as reasonable attorney's fees at trial $85,000.00, on appeal to the court of appeals $22,000.00, and an application for writ or error to the supreme court $10,000.00. In other words, the Association contends that since Sealock was entitled only to an amount substantially less than the jury found as damages, attorney's fees of $117,000.00 is too large an award. Neither party contests the propriety of an award of attorney's fees under TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 et seq. (Vernon 1986).

Frank McLain, Sealock's attorney, testified that he and other members of his firm had spent 953.9 hours working on Sealock's case. The work involved extensive briefing

for motions for summary judgment, numerous depositions, new preparations for four different trial settings, and legal research involving employment agreements and stock option agreements. McLain testified that the hourly fees, depending upon the attorney involved, ranged from $60.00 to $150.00. He further testified that $85,000.00 would be a fair and reasonable charge for similar legal services in Dallas. For appeal to the court of appeals, McLain estimated attorney's fees of $20,000.00 to $24,000.00, and on application for writ of error he estimated reasonable attorney's fees to be $10,000.00 to $12,000.00. Counsel for the Association stipulated to McLain's qualifications.

In deciding the reasonable value of attorney's fees, the fact-finder may consider such things as the time and labor involved; the nature and complexities of the case; the amount of money or value of property or interest involved; the extent of responsibilities assumed by the attorney; whether other employment is lost because of the undertaking; the benefits resulting to the client from the services; contingency or certainty of compensation; and whether the employment is casual or for an established or constant client. *First National Bank of Mercedes v. La Sara Grain Co.*, 676 S.W.2d 183, 184 (Tex.App.—Corpus Christi 1984, no writ); *Braswell v. Braswell*, 476 S.W.2d 444, 446 (Tex.Civ.App.—Waco 1972, writ dism'd). Although the award of attorney's fees should ordinarily bear some reasonable proportion to the amount of money involved in the litigation, *La Sara*, 676 S.W.2d at 185; *Magids v. Dorman*, 430 S.W.2d 910, 912 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.), this is only one factor to be considered in determining the reasonableness of the award. *See Braswell*, 476 S.W.2d at 446; *Knopf v. Standard Fixtures Co.*, 581 S.W.2d 504, 507 (Tex.Civ.App.—Dallas 1979, no writ). In *Stuckey v. White*, 647 S.W.2d 35 (Tex.App.—Houston [1st Dist.] 1982, no writ), for example, the court upheld an award of $33,000.00 attorney's fees when the total damage award was $14,339.00.

McLain testified as to the complexity of the case and to the number of hours devoted to the case by him and by other members of his firm. An overall review of the record reveals a controversy that is both factually and legally complex. Pre-trial matters involved numerous motions for summary judgment and numerous depositions. The case went to trial on the sixth amended pleadings. The trial itself lasted a week, and involved the introduction of seventy-five exhibits. I would hold that the amount of attorney's fees awarded was not excessive, and overrule point of error fourteen.

The judgment of the trial court should be affirmed as reformed to reflect damages of $189,174.00, remanded for recalculation of prejudgment interest, and affirmed in all other respects.