# SCHREIBER *v.* BURLINGTON NORTHERN, INC., ET AL.

No. 83–2129.   Argued January 9, 1985—Decided June 4, 1985

2

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the case, and O'CONNOR, J., who took no part in the consideration or decision of the case.

*Irving Bizar* argued the cause and filed briefs for petitioner.

*Marc P. Cherno* argued the cause for respondents. With him on the brief were *Robert K. Payson, Harvey L. Pitt, Stephen D. Alexander, A. Gilchrist Sparks III,* and *Howard W. Goldstein.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve a conflict in the Circuits over whether misrepresentation or nondisclosure is a necessary element of a violation of § 14(e) of the Securities Exchange Act of 1934, 15 U. S. C. § 78n(e).

I

On December 21, 1982, Burlington Northern, Inc., made a hostile tender offer for El Paso Gas Co. Through a wholly

owned subsidiary, Burlington proposed to purchase 25.1 million El Paso shares at $24 per share. Burlington reserved the right to terminate the offer if any of several specified events occurred. El Paso management initially opposed the takeover, but its shareholders responded favorably, fully subscribing the offer by the December 30, 1982, deadline.

Burlington did not accept those tendered shares; instead, after negotiations with El Paso management, Burlington announced on January 10, 1983, the terms of a new and friendly takeover agreement. Pursuant to the new agreement, Burlington undertook, *inter alia*, to (1) rescind the December tender offer, (2) purchase 4,166,667 shares from El Paso at $24 per share, (3) substitute a new tender offer for only 21 million shares at $24 per share, (4) provide procedural protections against a squeeze-out merger[1] of the remaining El Paso shareholders, and (5) recognize "golden parachute"[2] con-

---

[1] A "squeeze-out" merger occurs when Corporation A, which holds a controlling interest in Corporation B, uses its control to merge B into itself or into a wholly owned subsidiary. The minority shareholders in Corporation B are, in effect, forced to sell their stock. The procedural protection provided in the agreement between El Paso and Burlington required the approval of non-Burlington members of El Paso's board of directors before a squeeze-out merger could proceed. Burlington eventually purchased all the remaining shares of El Paso for $12 cash and one-quarter share of Burlington preferred stock per share. The parties dispute whether this consideration was equal to that paid to those tendering during the January tender offer.

[2] Petitioner alleged in her complaint that respondent Burlington failed to disclose that four officers of El Paso had entered into "golden parachute" agreements with El Paso for "extended employment benefits in the event El Paso should be taken over, which benefits would give them millions of dollars of extra compensation." The term "golden parachute" refers generally to agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership. As described in the Schedule 14D-9 filed by El Paso with the Securities and Exchange Commission on January 12, 1983, El Paso entered into "employment agreements" with two of its officers for a period of not less than five years, and with two other officers for a period of three years. The Schedule 14D-9 also disclosed that El Paso's Deferred Compensation Plan had

4

tracts between El Paso and four of its senior officers. By February 8, more than 40 million shares were tendered in response to Burlington's January offer, and the takeover was completed.

The rescission of the first tender offer caused a diminished payment to those shareholders who had tendered during the first offer. The January offer was greatly oversubscribed and consequently those shareholders who retendered were subject to substantial proration. Petitioner Barbara Schreiber filed suit on behalf of herself and similarly situated shareholders, alleging that Burlington, El Paso, and members of El Paso's board of directors violated § 14(e)'s prohibition of "fraudulent, deceptive, or manipulative acts or practices . . . in connection with any' tender offer." 15 U. S. C. § 78n(e). She claimed that Burlington's withdrawal of the December tender offer coupled with the substitution of the January tender offer was a "manipulative" distortion of the market for El Paso stock. Schreiber also alleged that Burlington violated § 14(e) by failing in the January offer to disclose the "golden parachutes" offered to four of El Paso's managers. She claims that this January nondisclosure was a deceptive act forbidden by § 14(e).

The District Court dismissed the suit for failure to state a claim. 568 F. Supp. 197 (Del. 1983). The District Court reasoned that the alleged manipulation did not involve a misrepresentation, and so did not violate § 14(e). The District Court relied on the fact that in cases involving alleged violations of § 10(b) of the Securities Exchange Act, 15 U. S. C. § 78j(b), this Court has required misrepresentation for there to be a "manipulative" violation of the section. 568 F. Supp., at 202.

The Court of Appeals for the Third Circuit affirmed. 731 F. 2d 163 (1984). The Court of Appeals held that the acts

been amended "to provide that for the purposes of such Plan a participant shall be deemed to have retired at the instance of the Company if his duties as a director, officer or employee of the Company have been diminished or curtailed by the Company in any material respect."

alleged did not violate the Williams Act, because "§ 14(e) was not intended to create a federal cause of action for all harms suffered because of the proffering or the withdrawal of tender offers." *Id.*, at 165. The Court of Appeals reasoned that § 14(e) was "enacted principally as a disclosure statute, designed to insure that fully-informed investors could intelligently decide how to respond to a tender offer." *Id.*, at 165–166. It concluded that the "arguable breach of contract" alleged by petitioner was not a "manipulative act" under § 14(e).

We granted certiorari to resolve the conflict,[3] 469 U. S. 815 (1984). We affirm.

## II

## A

We are asked in this case to interpret § 14(e) of the Securities Exchange Act, 82 Stat. 457, as amended, 15 U. S. C. § 78n(e). The starting point is the language of the statute. Section 14(e) provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or

---

[3] The Court of Appeals for the Sixth Circuit has held that manipulation does not always require an element of misrepresentation or nondisclosure. *Mobil Corp.* v. *Marathon Oil Co.*, 669 F. 2d 366 (1981), cert. denied, 455 U. S. 982 (1982). The Court of Appeals for the Second and Eighth Circuits have applied an analysis consistent with the one we apply today. *Feldbaum* v. *Avon Products, Inc.*, 741 F. 2d 234 (CA8 1984); *Buffalo Forge Co.* v. *Ogden Corp.*, 717 F. 2d 757 (CA2), cert. denied, 464 U. S. 1018 (1983); *Data Probe Acquisition Corp.* v. *Datatab, Inc.*, 722 F. 2d 1 (CA2 1983), cert. denied, 465 U. S. 1052 (1984).

invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

Petitioner relies on a construction of the phrase, "fraudulent, deceptive, or manipulative acts or practices." Petitioner reads the phrase "fraudulent, deceptive, or manipulative acts or practices" to include acts which, although fully disclosed, "artificially" affect the price of the takeover target's stock. Petitioner's interpretation relies on the belief that § 14(e) is directed at purposes broader than providing full and true information to investors.

Petitioner's reading of the term "manipulative" conflicts with the normal meaning of the term. We have held in the context of an alleged violation of § 10(b) of the Securities Exchange Act:

> "Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with the securities markets. It connotes intentional or willful conduct *designed to deceive or defraud* investors by controlling or artificially affecting the price of securities." *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 199 (1976) (emphasis added).

Other cases interpreting the term reflect its use as a general term comprising a range of misleading practices:

> "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. . . . Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative'—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act '"to substitute

a philosophy of full disclosure for the philosophy of *caveat emptor . . . .*"' . . . Indeed, nondisclosure is usually essential to the success of a manipulative scheme. . . . No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 476–477 (1977).

The meaning the Court has given the term "manipulative" is consistent with the use of the term at common law,[4] and with its traditional dictionary definition.[5]

She argues, however, that the term "manipulative" takes on a meaning in § 14(e) that is different from the meaning it has in § 10(b). Petitioner claims that the use of the disjunctive "or" in § 14(e) implies that acts need not be deceptive or fraudulent to be manipulative. But Congress used the phrase "manipulative or deceptive" in § 10(b) as well, and we have interpreted "manipulative" in that context to require

---

[4] See generally L. Loss, Securities Regulation 984–989 (3d ed. 1983). For example, the seminal English case of *Scott* v. *Brown, Doering, McNab & Co.,* [1892] 2 Q. B. 724 (C. A.), which broke new ground in recognizing that manipulation could occur without the dissemination of false statements, nonetheless placed emphasis on the presence of deception. As Lord Lopes stated in that case, "I can see no substantial distinction between false rumours and false and fictitious acts." *Id.,* at 730. See also *United States* v. *Brown,* 5 F. Supp. 81, 85 (SDNY 1933) ("[E]ven a speculator is entitled not to have any present fact involving the subject matter of his speculative purchase or the price thereof misrepresented by word or act").

[5] See Webster's Third New International Dictionary 1376 (1971) (Manipulation is "management with use of unfair, scheming, or underhanded methods").

8

misrepresentation.[6]   Moreover, it is a "'familiar principle of statutory construction that words grouped in a list should be given related meaning.'"   *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U. S. 207, 218 (1984).   All three species of misconduct, *i. e.*, "fraudulent, deceptive, or manipulative," listed by Congress are directed at failures to disclose.   The use of the term "manipulative" provides emphasis and guidance to those who must determine which types of acts are reached by the statute; it does not suggest a deviation from the section's facial and primary concern with disclosure or congressional concern with disclosure which is the core of the Act.

B

Our conclusion that "manipulative" acts under § 14(e) require misrepresentation or nondisclosure is buttressed by the purpose and legislative history of the provision.   Section 14(e) was originally added to the Securities Exchange Act as part of the Williams Act, 82 Stat. 457.   "The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49, 58 (1975).[7]

It is clear that Congress relied primarily on disclosure to implement the purpose of the Williams Act.   Senator Williams, the bill's Senate sponsor, stated in the debate:

"Today, the public shareholder in deciding whether to accept or reject a tender offer possesses limited information.   No matter what he does, he acts without adequate knowledge to enable him to decide rationally what is the best course of action.   This is precisely the dilemma

---

[6] *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 476–477 (1977); *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 43 (1977); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 199 (1976).

[7] For a more thorough discussion of the legislative history of the Williams Act, see *Piper* v. *Chris-Craft Industries, Inc., supra*, at 24–37.

which our securities laws are designed to prevent." 113 Cong. Rec. 24664 (1967).

The expressed legislative intent was to preserve a neutral setting in which the contenders could fully present their arguments.[8] The Senate sponsor went on to say:

"We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids. S. 510 is designed solely to require full and fair disclosure for the benefit of investors. The bill will at the same time provide the offeror and management equal opportunity to present their case." *Ibid.*

To implement this objective, the Williams Act added §§ 13(d), 13(e), 14(d), 14(e), and 14(f) to the Securities Exchange Act. Some relate to disclosure; §§ 13(d), 14(d), and 14(f) all add specific registration and disclosure provisions. Others—§§ 13(e) and 14(d)—require or prohibit certain acts so that investors will possess additional time within which to take advantage of the disclosed information.[9]

---

[8] The process through which Congress developed the Williams Act also suggests a calculated reliance on disclosure, rather than court-imposed principles of "fairness" or "artificiality," as the preferred method of market regulation. For example, as the bill progressed through hearings, both Houses of Congress became concerned that corporate stock repurchases could be used to distort the market for corporate control. Congress addressed this problem with § 13(e), which imposes specific disclosure duties on corporations purchasing stock and grants broad regulatory power to the Securities and Exchange Commission to regulate such repurchases. Congress stopped short, however, of imposing specific substantive requirements forbidding corporations to trade in their own stock for the purpose of maintaining its price. The specific regulatory scheme set forth in § 13(e) would be unnecessary if Congress at the same time had endowed the term "manipulative" in § 14(e) with broad substantive significance.

[9] Section 13(d) requires those acquiring a certain threshold percentage of a company's stock to file reports disclosing such information as the purchaser's background and identity, the source of the funds to be used in making the purchase, the purpose of the purchase, and the extent of

Section 14(e) adds a "broad antifraud prohibition," *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 24 (1977), modeled on the antifraud provisions of § 10(b) of the Act and Rule 10b–5, 17 CFR § 240.10b–5 (1984).[10]    It supplements the

the purchaser's holdings in the target company.    15 U. S. C. § 78m(d). Section 13(e) imposes restrictions on certain repurchases of stock by corporate issuers.    15 U. S. C. § 78m(e).    Section 14(d) imposes specific disclosure requirements on those making a tender offer.    15 U. S. C. § 78n(d)(1).    Section 14(d) also imposes specific substantive requirements on those making a tender offer.    These requirements include allowing shareholders to withdraw tendered shares at certain times during the bidding process, 15 U. S. C. § 78n(d)(5), the proration of share purchases when the number of shares tendered exceeds the number of shares sought, 15 U. S. C. § 78n(d)(6), and the payment of the same price to all those whose shares are purchased, 15 U. S. C. § 78n(d)(7).    Section 14(f) imposes disclosure requirements when new corporate directors are chosen as the result of a tender offer.

    [10] Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, . . .

    "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."    15 U. S. C. § 78j(b).

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    "(a) To employ any device, scheme, or artifice to defraud,

    "(b) To make any untrue statement of a material fact or to omit to state a fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    "(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."    17 CFR § 240.10b–5 (1984).

    Because of the textual similarities, it is often assumed that § 14(e) was modeled on § 10(b) and Rule 10b–5.    See, *e. g., Panter* v. *Marshall Field & Co.*, 646 F. 2d 271, 283 (CA7), cert. denied, 454 U. S. 1092 (1981).    For the purpose of interpreting the term "manipulative," the most significant changes from the language of § 10(b) were the addition of the term "fraudu-

more precise disclosure provisions found elsewhere in the Williams Act, while requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b).

While legislative history specifically concerning § 14(e) is sparse, the House and Senate Reports discuss the role of § 14(e). Describing § 14(e) as regulating "fraudulent transactions," and stating the thrust of the section:

> "This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make *full disclosure* of material information to those with whom they deal." H. R. Rep. No. 1711, 90th Cong., 2d Sess., 11 (1968) (emphasis added); S. Rep. No. 550, 90th Cong., 1st Sess., 11 (1967) (emphasis added).

Nowhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure,[11] or that the term "manipulative" should be read as an

---

lent," and the reference to "acts" rather than "devices." Neither change bears in any obvious way on the meaning to be given to "manipulative."

Similar terminology is also found in § 15(c) of the Securities Exchange Act, 15 U. S. C. § 78*o*(c), § 17(a) of the Securities Act of 1933, 15 U. S. C. § 77q(a), and § 206 of the Investment Advisers Act of 1940, 15 U. S. C. § 80b–6.

[11] The Act was amended in 1970, and Congress added to § 14(e) the sentence, "The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." Petitioner argues that this phrase would be pointless if § 14(e) was concerned with disclosure only.

We disagree. In adding the 1970 amendment, Congress simply provided a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or nondisclosure. The amendment gives the Securities and Exchange Commission latitude to regulate nondeceptive activities as a "reasonably designed" means of preventing manipulative acts, without suggesting any change in the meaning of the term "manipulative" itself.

.

invitation to the courts to oversee the substantive fairness of tender offers; the quality of any offer is a matter for the marketplace.

To adopt the reading of the term "manipulative" urged by petitioner would not only be unwarranted in light of the legislative purpose but would be at odds with it.   Inviting judges to read the term "manipulative" with their own sense of what constitutes "unfair" or "artificial" conduct would inject uncertainty into the tender offer process.   An essential piece of information—whether the court would deem the fully disclosed actions of one side or the other to be "manipulative"—would not be available until after the tender offer had closed.   This uncertainty would directly contradict the expressed congressional desire to give investors full information.

Congress' consistent emphasis on disclosure persuades us that it intended takeover contests to be addressed to shareholders.   In pursuit of this goal, Congress, consistent with the core mechanism of the Securities Exchange Act, created sweeping disclosure requirements and narrow substantive safeguards.   The same Congress that placed such emphasis on shareholder choice would not at the same time have required judges to oversee tender offers for substantive fairness.   It is even less likely that a Congress implementing that intention would express it only through the use of a single word placed in the middle of a provision otherwise devoted to disclosure.

C

We hold that the term "manipulative" as used in § 14(e) requires misrepresentation or nondisclosure.   It connotes "conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 199.   Without misrepresentation or nondisclosure, § 14(e) has not been violated.

Applying that definition to this case, we hold that the actions of respondents were not manipulative.   The amended complaint fails to allege that the cancellation of the first

tender offer was accompanied by any misrepresentation, non-disclosure, or deception. The District Court correctly found: "All activity of the defendants that could have conceivably affected the price of El Paso shares was done openly." 568 F. Supp., at 203.

Petitioner also alleges that El Paso management and Burlington entered into certain undisclosed and deceptive agreements during the making of the second tender offer. The substance of the allegations is that, in return for certain undisclosed benefits, El Paso managers agreed to support the second tender offer. But both courts noted that petitioner's complaint seeks only redress for injuries related to the cancellation of the first tender offer. Since the deceptive and misleading acts alleged by petitioner all occurred with reference to the making of the second tender offer—when the injuries suffered by petitioner had already been sustained—these acts bear no possible causal relationship to petitioner's alleged injuries. The Court of Appeals dealt correctly with this claim.

## III

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE O'CONNOR took no part in the consideration or decision of this case.