107 F.3d 139
 65 USLW 2579, 20 Employee Benefits Cas. 2510,
Pens. Plan Guide (CCH) P 23931W
 The BOARD OF TRUSTEES OF THE CWA/ITU NEGOTIATED PENSION PLAN
and John Foss, as the Administrator of the CWA/ITU
Negotiated Pension Plan,
Plaintiffs-Counter-Defendants-Appellees,
v.
Melvin WEINSTEIN, Defendant-Counter-Claimant-Appellant.
 No. 531, Docket 96-7488.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 18, 1996.
Decided Feb. 24, 1997.
 
 Andrew Irving, New York City (James F. Gill, Robinson Silverman Pearce Aronsohn & Berman, New York City, on the brief), for Plaintiffs-Counter-Defendants-Appellees.
 David S. Preminger, New York City (Rosen, Preminger & Bloom, New York City, Bonnie H. Weinstein, Washington, DC, on the brief), for Defendant-Counter-Claimant-Appellant.
 Feder & Associates, Washington, DC (Diana L.S. Peters, Gerald M. Feder, Kathryn Bakich, Washington, DC, of counsel), filed a brief for amicus curiae National Coordinating Committee for Multiemployer Plans in support of Appellees.
 Sigman, Lewis & Feinberg, Oakland, CA (Daniel Feinberg, Oakland, CA, Mary Ellen Signorille, Cathy Ventrell-Monsees, Melvin Radowitz, Washington, DC, of counsel), filed a brief for amici curiae National Employment Lawyers Association and American Association of Retired Persons in support of Appellant.
 Before: KEARSE and CABRANES, Circuit Judges, and KELLEHER, District Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Defendant Melvin Weinstein appeals from a final judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, declaring that the Employee Retirement Income Security Act ("ERISA" or the "Act"), 29 U.S.C. § 1001 et seq. (1994), does not require plaintiffs Board of Trustees of the CWA/ITU Negotiated Pension Plan ("Plan") and Plan administrator John Foss (collectively the "Administrators") to disclose actuarial valuation reports to Weinstein, a participant in the Plan, and dismissing Weinstein's ERISA counterclaims seeking disclosure and penalties for nondisclosure of such reports. The district court granted summary judgment in favor of the Administrators on the ground that actuarial valuation reports are not subject to disclosure upon the written request of a participant in an employee benefit plan under ERISA because they are not "instruments under which the plan is established or operated," 29 U.S.C. § 1024(b)(4). On appeal, Weinstein contends principally that the district court erred in ruling that ERISA does not require disclosure of the requested reports and in denying him statutory penalties on account of the Administrators' refusal to disclose. For the reasons that follow, we agree with the district court that disclosure was not required, and we therefore affirm the judgment.
 
 I. BACKGROUND
 
 2
 Weinstein is a retiree who has been a participant in the Plan since 1969. In 1995, concerned that improper actuarial allocations of pension-plan contributions might be reducing the pension benefits payable to Plan participants, he wrote to Foss, requesting copies of the Plan's annual reports and actuarial valuation reports for the years 1992 through 1994. Foss supplied copies of the annual reports but not the actuarial valuation reports. When Weinstein renewed his request for the actuarial valuation reports, Foss responded that those reports were "largely duplicative" of the information in the actuarial statements shown in Schedule B of the Plan's annual reports, which Weinstein had been sent, and that the data contained in the complete actuarial valuation reports were "statistical, highly technical, quite voluminous and ... unlikely to provide further clarification of the Plan's funding status." Sending Weinstein the table of contents from the most recent actuarial valuation report, Foss asked him to identify the particular portions in which he was interested. Weinstein persisted in his request for complete copies of the actuarial valuation reports.
 
 
 3
 In June 1995, the Administrators commenced the present action, requesting a declaratory judgment that ERISA does not require them to disclose actuarial valuation reports to Plan participants. Weinstein counterclaimed, seeking disclosure of the reports and alleging that the Administrators' refusal to provide him with copies of the reports breached both their disclosure obligation under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), and their fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). Further, invoking ERISA § 502(c)(1), Weinstein sought the imposition of monetary penalties on the Administrators for nondisclosure. See 29 U.S.C. § 1132(c)(1) (court has discretion to order administrator to pay penalty of $100 per day for each day, in excess of 30, of failure to make a disclosure required by ERISA).
 
 
 4
 The Administrators moved for summary judgment on the ground that actuarial valuation reports are not subject to disclosure under § 104(b)(4) because they are not "instruments under which [a] plan is established or operated." They argued that such reports do not set forth rules or procedures used in the operation or maintenance of the Plan and that they do not contain any information used to calculate a participant's benefits or eligibility for benefits. Weinstein opposed the motion, arguing that actuarial valuation reports are needed for the preparation of a plan's annual report, see, e.g., 29 U.S.C. § 1023(d), and that such reports set forth the basis for the Plan's funding method as well as the basis for its assumptions as to, e.g., average retirement age, interest rate at which the plan's assets will grow, and mortality, which dictate the level of benefits a plan can afford. Thus, he argued that actuarial valuation reports are documents used in the operation of the Plan and hence are subject to disclosure under § 104(b)(4).
 
 
 5
 In a decision from the bench on March 11, 1996, the district court granted the Administrators' motion for summary judgment on their declaratory judgment claim and dismissed Weinstein's counterclaims. The court stated that, although the term "instruments" is not defined in ERISA, "plaintiff has the more persuasive argument that [the phrase] instrument under which the plan is established or operated suggests more than mere information." (Hearing Transcript, March 11, 1996, at 25.) Noting that actuarial valuation reports contain "pure information" and could not be considered "governing documents," the court ruled that ERISA does not require the Administrators to disclose the contents of those reports to Plan participants. (Id. at 26, 27.)
 
 
 6
 Judgment was entered accordingly, and this appeal followed.
 
 II. DISCUSSION
 
 7
 On appeal, Weinstein contends that the district court erred in ruling that ERISA does not require disclosure of the requested actuarial valuation reports and in denying him statutory penalties on account of the Administrators' refusal to disclose. He argues principally (1) that because ERISA requires plan administrators periodically to obtain actuarial valuations, such reports are properly classified as instruments under which a plan is operated, and (2) that ERISA's goal of providing information to plan participants favors disclosure of such reports. Weinstein also contends that the district court lacked jurisdiction to entertain the present suit and that the complaint failed to state a claim on which relief can be granted. We are unpersuaded.
 
 
 8
 A. Weinstein's Procedural Challenges to the Action
 
 
 9
 Weinstein contends that the district court lacked subject matter jurisdiction of the present action because ERISA does not give a plan administrator standing to bring suit. This contention is meritless.
 
 
 10
 Section 502(e)(1) of ERISA grants the district courts jurisdiction to hear civil actions under the Act brought by, inter alios, an employee pension plan's "fiduciary." 29 U.S.C. § 1132(e)(1). Section 3(21)(A)(iii) of ERISA defines a "fiduciary" to include a person who "has any discretionary authority or discretionary responsibility in the administration of [an employee benefit] plan." 29 U.S.C. § 1002(21)(A)(iii); see also id. § 1002(21)(A)(i) ("fiduciary" includes one who "exercises any discretionary authority or discretionary control respecting management of [an employee benefit] plan or exercises any authority or control respecting management or disposition of its assets"). Regulations promulgated by the Department of Labor interpreting ERISA make clear that the administrator and trustees of a pension plan are fiduciaries within the meaning of the statute, for "a plan administrator or a trustee of a plan must, b[y] the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan within the meaning of section 3(21)(A)(iii)...." 29 C.F.R. § 2509.75-8 D-3 (1996). Accordingly, the district court had jurisdiction to entertain this suit brought by, inter alios, Foss as the Plan's administrator.
 
 
 11
 Nor is there merit in Weinstein's contention that the complaint fails to state a claim. Section 502(a)(3)(B) of ERISA provides, inter alia, that a fiduciary may bring a civil action "to obtain ... appropriate equitable relief ... to enforce any provisions of this subchapter." 29 U.S.C. § 1132(a)(3)(B). The Administrators' request for equitable relief in the form of a declaratory judgment that ERISA § 104(b)(4) does not require disclosure of the actuarial valuation reports demanded by Weinstein constituted a request for the enforcement of that section in accordance with plaintiffs' interpretation of its scope.
 
 B. The Merits
 
 12
 Section 104(b)(4) of ERISA provides, in pertinent part, as follows:
 
 
 13
 The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.
 
 
 14
 29 U.S.C. § 1024(b)(4) (emphasis added). For the reasons that follow, we conclude that actuarial valuation reports do not fall within this section.
 
 
 15
 1. The Meaning of "Instrument"
 
 
 16
 The Act does not define "instrument." Generally, however, as that term is used in the law, it refers to a document that sets out rights, duties, or obligations, or has some other legal effect. See, e.g., Webster's Third New International Dictionary 1172 (1976) (defining "instrument," in pertinent part, as "a legal document (as a deed, will, bond, lease, agreement, mortgage, note, power of attorney, ticket on carrier, bill of lading, insurance policy, warrant, writ) evidencing legal rights or duties esp. of one party to another"); Black's Law Dictionary 941 (4th ed. 1951) ("[a] document or writing which gives formal expression to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right"). The term "instrument" itself, therefore connotes a formal legal document.
 
 
 17
 The clause in which the term is used in § 104(b)(4), i.e., "instruments under which [a] plan is ... operated" (emphasis added), further supports this view. Use of the preposition "under," rather than with or through, suggests that by "instruments," Congress meant the formal legal documents that govern or confine a plan's operations, rather than the routine documents with which or by means of which a plan conducts its operations. The Fourth Circuit in Faircloth v. Lundy Packing Co., 91 F.3d 648 (4th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997), has reached a similar conclusion, ruling that the language of § 104(b)(4) confines administrators' disclosure obligations under that section to governing documents:
 
 
 18
 the statutory language "other instruments under which the plan is established or operated" is clear and unambiguous. "Instrument" means "[a] formal or legal document in writing, such as a contract, deed, will, bond, or lease.... Anything reduced to writing, a document of a formal or solemn character...." Black's Law Dictionary 801 (6th ed.1990); see also Webster's New World Dictionary 700 (3d college ed.1991) (defining "instrument" as "a formal document, [such] as a deed, contract, etc."). "Establish" means "to order, ordain, or enact ... permanently" or "to set up." Webster's New World Dictionary at 465. "Operate" means "to conduct or direct the affairs of (a business, etc.); manage." Id. at 949. Therefore, the language "other instruments under which the plan is established or operated" encompasses formal or legal documents under which a plan is set up or managed.
 
 
 19
 91 F.3d at 653.
 
 
 20
 Additional support for this interpretation is found in the context in which the "other instruments" clause is used in § 104(b)(4), for it is "a familiar principle of statutory construction that words grouped in a list should be given related meaning," Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) (internal quotation marks omitted); see Hughes Salaried Retirees Action Committee v. Administrator of the Hughes Non-Bargaining Retirement Plan, 72 F.3d 686, 689 (9th Cir.1995) (en banc) ("Hughes "), cert. denied, --- U.S. ----, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). The specific types of documents that, according to § 104(b)(4), must be disclosed to plan participants on demand are "plan description[s]," "summary plan description[s]," "the latest annual report," "any terminal report," "the bargaining agreement," "trust agreement[s]," and "contract[s]." All of these are formal documents. Agreements and contracts plainly set out rights and duties; the plan description sets out employee rights and employer obligations, see 29 U.S.C. § 1022(b); summary plan descriptions, which a company is required to furnish its employees, see id. § 1024(b)(1), must describe, inter alia, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," id. § 1022(b); and the annual and terminal reports provide formal disclosure of the administrators' performance of the duties imposed on them by plan instruments or by law. Thus, interpreting the clause "other instruments under which the plan is established or operated" as being related to the categories of documents specifically listed in § 104(b)(4) further supports our view that that clause was meant to refer to formal documents that govern the plan, not to all documents by means of which the plan conducts operations. As the Ninth Circuit stated in its en banc decision in Hughes, "s 104(b)(4) requires the disclosure of only the documents described with particularity and 'other instruments' similar in nature." 72 F.3d at 691.
 
 
 21
 Moreover, we note that the use of the term "instrument" to connote a formal governing document is echoed in other sections of ERISA. Section 402(a)(1) of the Act, for example, provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). That instrument, in turn, names the administrator and trustees of the pension plan, see id. § 1002(16)(A)(i) (defining "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated"); id. § 1103(a) ("trustee or trustees shall be ... named ... in the plan instrument described in section 1102(a) ...."); and it sets forth the fiduciaries' duties, see id. § 1105(c)(1) ("The instrument under which a plan is maintained may expressly provide for procedures ... for allocating fiduciary responsibilities ...."); id. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan ... in accordance with the documents and instruments governing the plan....").
 
 
 22
 In contrast, other sections of ERISA, which require that information be disclosed to regulatory agencies, list far broader categories of documents. For example, ERISA authorizes the Secretary of Labor to "require the submission of [a plan's] reports, books, and records." Id. § 1134(a)(1) (emphasis added). Similarly, the Comptroller General is given the "right to examine and copy any [of a plan's] books, documents, papers, records, or other recorded information." Id. § 1143a(2) (emphasis added). The provision for disclosure of these virtually all-encompassing categories of documents to federal officials provides further support for the inference that, in fashioning § 104(b)(4)'s more limited specification of the categories of documents that must be disclosed to plan participants, Congress did not mean the clause "instruments under which the plan is ... operated" to encompass all of the plan's papers, documents, recorded information, or reports.
 
 
 23
 The legislative history of ERISA does not suggest a contrary conclusion. That history reveals that ERISA's disclosure requirements were meant to arm plan participants with specific knowledge of their rights and remedies with respect to employee benefit plans, rather than to compel disclosure of the more technical data contained in actuarial valuation reports. The precursors to ERISA's disclosure provisions were found in the Welfare and Pension Plans Disclosure Act ("Disclosure Act"), Pub.L. No. 85-836, 72 Stat. 997 (1958) (codified at 29 U.S.C. §§ 301-309 (1958)), which did not require plans to disclose more than their annual reports and plan descriptions, see 29 U.S.C. § 304(a) (1958). Finding that the Disclosure Act was "weak in its limited disclosure requirements," and "inadequa[te]" in "protecting rights and benefits due to workers," H.R.Rep. No. 93-533 (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4642, Congress enacted broader disclosure requirements in ERISA, noting that the new
 
 
 24
 reporting requirements [are] designed to disclose more significant information about plans and the transactions engaged in by those controlling plan operations and to provide specific data to participants and beneficiaries concerning the rights and benefits they are entitled to under the plans and the circumstances which may result in their not being entitled to benefits.
 
 
 25
 Id. at 4648. These stated goals, i.e., of providing plan participants with more significant information about (1) the plans, (2) their rights and benefits, (3) how those rights could be lost, and (4) transactions by plan fiduciaries, in no way suggest that the information to which plan participants are entitled is unlimited. Accord Hughes, 72 F.3d at 690 (documents subject to disclosure under § 104(b)(4) are "those that allow 'the individual participant [to] know[ ] exactly where he stands with respect to the plan--what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted' " (quoting S.Rep. No. 93-127 (1974), reprinted in 1974 U.S.C.C.A.N. 4838, 4863)). Accordingly, the legislative history does not persuade us that the "instruments" referred to in § 104(b)(4) encompass more than governing documents.
 
 
 26
 2. The Nature of Actuarial Valuation Reports
 
 
 27
 An actuarial valuation report is a document, prepared by the plan's actuaries, that describes a plan's "current funded status and future funding obligations." R. Weinberg, "The Actuarial Process," Trustees Handbook: A Basic Text on Labor-Management Employee Benefit Plans 208, 208 (Marc Gertner ed., 4th ed. 1990). Such a report "includes development of contribution and funding policy requirements, summaries of actuarial methods and assumptions employed, and a summary of plan provisions valued by the actuary." Id. at 210; see also D. McGinn, Pension Funding: Actuarial Primer for Corporate Management 69 (2d ed. 1982) (actuarial valuation reports describe "the ability of the plan ... to meet future benefit commitments"); L. Rappaport & S. Arpin, "A Primer on Due Diligence in the Employee Benefits Area," Conducting Due Diligence 1996, at 995, 1008 (PLI Corp. Law & Practice Course Handbook Series No. B4-7131, 1996) (actuarial valuation reports contain "demographic information regarding the plan participants, a summary of plan provisions, a complete list of all the assumptions utilized and, frequently, a historical summary of important cost measures").
 
 
 28
 ERISA requires that plan actuaries "make an actuarial valuation of the plan for every third plan year." See 29 U.S.C. § 1023(d). The statute contains no requirement that an actuarial valuation report be prepared at shorter intervals unless the actuary thinks a more frequent valuation is needed to support the opinion that is to be included in Schedule B of the plan's annual report. See id. Nor does ERISA require that the actuarial valuation report be reproduced in toto in the plan's annual report. Rather, the annual report need only contain a summary statement of the plan's actuarial valuation, i.e., Schedule B. See id. §§ 1023(a)(1)(B)(ii) and (d). As a part of the annual report, of course, Schedule B is expressly subject to disclosure under § 104(b)(4).
 
 
 29
 As Weinstein's counsel stated at oral argument of this appeal, plan fiduciaries are not required to accept the recommendations made in an actuarial valuation report. Although such a report contains pertinent information about the plan, the administrators and trustees are not bound by the report and need not use its data in their decisions, for while the report may describe various rights and obligations, the report itself does not establish those rights, or the policies or procedures for calculating the benefits to which plan participants are entitled, or the procedures that are prerequisite to obtaining benefits, or the duties, obligations, or contracts of the plan fiduciaries. Thus, actuarial valuation reports are more akin to status reports or advisory opinions than to the formal instruments governing a plan's operations. The mere presence of a description of rights or obligations that are established elsewhere does not make the descriptive document an "instrument[ ] under which" the plan is operated.
 
 
 30
 Since actuarial valuation reports are not mentioned in § 104(b)(4), are not required to be reproduced within any of the documents that that section does mention, are not sources of data that plan administrators are required to use, and are not sources of the rights or obligations of any of the participants, beneficiaries, or fiduciaries, we conclude that actuarial valuation reports are not within the scope of § 104(b)(4). Though such reports doubtless contain information that plan participants might find interesting or useful, we agree with the Fourth Circuit's decision in Faircloth v. Lundy Packing Co., which ruled that § 104(b)(4) is not sufficiently broad to require disclosure of any and all "documents that would assist participants and beneficiaries in determining their rights under a plan and in determining whether a plan is being properly administered," 91 F.3d at 653.
 
 
 31
 [I]f Congress had intended § 104(b)(4) to encompass all documents that provide information about the plan and benefits, Congress could have used language to that effect. Instead, Congress used language limiting § 104(b)(4) to "instruments under which the plan is established or operated." The clear and unambiguous meaning of this statutory language encompasses only formal or legal documents under which a plan is set up or managed.
 
 
 32
 Id. at 654.
 
 
 33
 We note that the Internal Revenue Code too requires that a pension plan file an "actuarial report," 26 U.S.C. § 6059(a); the regulations thereunder make clear, however, that that report is the same summary statement that is included as Schedule B of a plan's annual report, see 26 C.F.R. § 301.6059-1(a) (1996) ("The actuarial report must be filed by the plan administrator ... on Schedule B as an attachment to the annual Return/Report of Employee Benefit Plan (Form 5500 series)."); see also 29 U.S.C. § 1023 official commentary ("Secretary of the Treasury and Secretary of Labor to take such steps as may be necessary to assure coordination to the maximum extent feasible between the actuarial reports required by [ERISA] and ... [the] Internal Revenue Code"). Thus, the Internal Revenue Code requires no more than does ERISA.
 
 
 34
 Weinstein has also called to our attention a July 1996 advisory opinion issued by the Department of Labor, several months after entry of the judgment at issue here, in an unrelated matter. In that opinion, the Department stated, with respect to § 104(b)(4), that
 
 
 35
 any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement under an employee benefit plan would constitute an instrument under which the plan is established or operated.... Accordingly, studies, schedules or similar documents that contain information and data ... that, in turn, serve as the basis for determining or calculating a participant's or beneficiary's benefit entitlements under an employee benefit plan would constitute "instruments under which the plan is ... operated."
 
 
 36
 Pension and Welfare Benefits Administration Opinion Letter 96-14A, 5A Pens. Plan Guide (CCH) p 19,984R, at 22,491-96 to -97 (July 31, 1996). The broad interpretation given by the Department in that opinion, which neither mentioned nor concerned actuarial valuation reports, has not been promulgated as a regulation, and we do not regard it as pertinent to the issue before us. The question before the Department was whether § 104(b)(4) required administrators of a welfare benefit plan to disclose to plan participants the plan's fee schedule pursuant to which the dollar amount that would be paid for health claims was to be determined. The Department's affirmative answer to that question was issued pursuant to an administrative procedure that specifies that "[o]nly the parties described in the request for opinion may rely on the opinion, and they may rely on the opinion only to the extent that ... the situation conforms to the situation described in the request for opinion." Employee Benefit Plans, Advisory Opinion Procedure, 41 Fed.Reg. 36281, 36283 (1976). The advisory opinion, which dealt with fee schedules, thus has no applicability to the actuarial valuation reports that are at issue in the present appeal.
 
 
 37
 The Sixth Circuit in Bartling v. Fruehauf Corp., 29 F.3d 1062 (6th Cir.1994), reaching a conclusion contrary to the one we reach here, has ruled that disclosure of such reports is required under § 104(b)(4) upon demand by plan participants. The Bartling court found in ERISA a presumption in favor of disclosure, see id. at 1070 ("all other things being equal, courts should favor disclosure where it would help participants understand their rights"), and concluded that actuarial valuation reports are "instruments under which the plan is ... operated" "[b]ecause an actuarial valuation report is required for every third plan year, § 1023(d)," and such a report is "indispensable to the operation of the plan." 29 F.3d at 1070. We disagree with this rationale. First, all other things are not equal, for Congress made express provision in § 104(b)(4) for certain types of documents to be disclosed upon demand of plan participants. As discussed in Part II.B.1. above, we infer from Congress's use of the limited term "instruments" in § 104(b)(4) for the disclosures that administrators must make when requested by plan participants, rather than broader terms such as "documents," "records," or "reports," as used elsewhere in ERISA to require disclosures to others, that Congress did not mean the duty imposed in § 104(b)(4) to extend to all documents, records, and reports. In light of the precise language used by Congress in the various sections of ERISA, we see no presumption favoring disclosure to participants beyond what is required by § 104(b)(4). Accord Faircloth v. Lundy Packing Co., 91 F.3d at 654 ("We find nothing in the clear and unambiguous statutory language to support [the Bartling court's] presumption."). Second, as discussed above, the fact that ERISA requires that an actuarial valuation report be prepared every three years is unpersuasive given that such reports do not set the rights or obligations of participants or fiduciaries and do not contain data that plan administrators are required to use. Finally, the view that an actuarial valuation report must be disclosed because it is "indispensable" to a plan's operation is unpersuasive because it provides no meaningful standard. We would suppose, for example, that lists of plan participants and lists of the plan's bank account numbers would also be indispensable. Under an indispensable-document test, virtually any report or record generated in the administration of a pension plan might be subject to disclosure. Had Congress meant to require unlimited disclosure, or even disclosure of all documents that would be useful to plan participants, it would not have used the restrictive "instruments under which" language.
 
 
 38
 For all of the foregoing reasons, we conclude that the district court correctly ruled that actuarial valuation reports are not governing documents and hence are not instruments under which a plan is established or operated.
 
 C. Other Arguments
 
 39
 Weinstein contends that the district court should not have granted summary judgment against him without allowing him to obtain discovery from plaintiffs as to precisely what the Plan's actuarial valuation reports contain or how the contents have been used. We disagree. Since administrators are not required to use such reports, their contents and whatever use is in fact made of them are not material to the question of whether such reports are "instruments under which" a plan operates, within the meaning of § 104(b)(4).
 
 
 40
 Weinstein also urges that if we reject his interpretation of § 104(b)(4), we should hold that the Administrators were required to provide him with copies of the actuarial valuation reports pursuant to their general fiduciary duties of loyalty and prudence, set out in ERISA §§ 404(a)(1)(A)-(D), see 29 U.S.C. §§ 1104(a)(1)(A)-(D), notwithstanding that "[t]hese provisions say nothing explicitly about providing documents to participants." (Weinstein brief on appeal at 39.) Since we have concluded that Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators' must disclose on demand of plan participants, we think it inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure. Accord Faircloth v. Lundy Packing Co., 91 F.3d at 657. In particular, we find in the general fiduciary duty provisions of ERISA no basis for requiring disclosure of the actuarial valuation reports demanded by Weinstein.
 
 CONCLUSION
 
 41
 We have considered all of Weinstein's contentions on appeal and have found them to be without merit. ERISA does not require plaintiff Administrators to disclose actuarial valuation reports. In light of this conclusion, Weinstein's contention that the district court erred in denying his request for monetary penalties for nondisclosure in violation of ERISA is moot.
 
 
 42
 The judgment of the district court is affirmed.
 
 
 
 *
 Honorable Robert J. Kelleher, of the United States District Court for the Central District of California, sitting by designation