# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 27, 2013

Lyle W. Cayce
Clerk

No. 12-40085

In the Matter of: PILGRIM'S PRIDE CORPORATION,

Debtor

----------------------------------------------

GARY HEATH AGERTON; JACOB WILSON AGERTON; JERRY AGERTON; SANDRA AGERTON; DANIEL ALBRITTON, ET AL.,

Appellees

v.

PILGRIM'S PRIDE CORPORATION,

Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS and SMITH, Circuit Judges.[*]

PER CURIAM:

Appellant Pilgrim's Pride Corporation ("PPC"), a large producer of processed chicken, idled a number of its chicken processing facilities with the alleged goal of reducing the excess chicken supply and increasing prices. Appellee chicken growers filed suit and obtained a money judgment against PPC

---

[*] This matter is being decided by a quorum. 28 U.S.C. § 46(d).

No. 12-40085

for damages the district court found arose from PPC's unlawful attempt to manipulate or control poultry prices. Because PPC's unilateral decision to reduce production was neither illegitimate nor anti-competitive, we REVERSE and RENDER judgment in favor of PPC.

I.

PPC, a Delaware corporation, is one of the world's largest suppliers of chicken and processed chicken products. The heart of PPC's operations is its network of chicken processing facilities located in the Southeast United States, from which it produces chicken for four primary product markets: (1) prepared chicken foods, (2) fresh food service, (3) retail or case-ready chicken, and (4) commodity chicken. PPC does not actually raise the chickens processed by these facilities, instead relying upon the husbandry services of dozens of local chicken growers. Under its Poultry Grower Agreements with chicken growers, PPC provides the chicks, feed, and other supplies, and the chicken growers provide the facilities and labor necessary to raise the chickens.

Facing severe economic difficulties in 2008, PPC ceased profitability and began losing substantial amounts of money. The primary reason for PPC's mounting financial problems appeared to be the company's over-extension into the commodity chicken market, of which PPC held an estimated 50% market share. When PPC evaluated its operations, it concluded that it was unnecessarily producing a surplus of commodity chicken at great cost to itself. In an effort to stem its losses and streamline operations, PPC closed or idled several processing and distribution facilities, divested assets, restructured supply contracts, and laid off a number of employees. However, these measures proved ineffective and PPC ultimately filed for Chapter 11 bankruptcy relief in December 2008.

One of the PPC facilities most affected by the company's financial challenges was its El Dorado, Arkansas, processing complex. Identified as a

No. 12-40085

potential candidate for strategic decommission, the El Dorado facility struggled with high operating costs, poor performance, and low-margin operations focused on commodity chicken. PPC hoped that by divesting itself of underperforming and unprofitable assets producing commodity chicken, it could increase profitability while de-emphasizing its position in a riskier market. By reducing PPC's output and the surplus supply of commodity chicken, it is also alleged that PPC hoped commodity chicken prices would stabilize at a higher equilibrium price.

After PPC filed for bankruptcy, it received approval from both the bankruptcy court and the unsecured creditors committee to idle or sell three of its processing complexes, including the El Dorado facility. PPC was unable to solicit an offer that even approached the El Dorado facility's appraised value, and the facility was officially idled in May 2009. As a result of the facility's closure, the husbandry services of some 163 contract chicken growers were no longer needed, and PPC rejected all related Poultry Grower Agreements.

In response to the termination of their growing agreements, a group of the affected chicken growers filed suit under the Packers and Stockyards Act of 1921 ("PSA"). 7 U.S.C. §§ 181 et seq. Specifically, the growers alleged that PPC had engaged in a course of business for the purpose of "manipulating or controlling prices" in violation of PSA § 192(e). The growers originally filed suit in bankruptcy court in the Northern District of Texas. A district judge then withdrew the reference to bankruptcy court and transferred the case to the Eastern District of Texas, where it was referred by consent to a magistrate judge under 28 U.S.C. § 636(c). At a trial before a magistrate judge, the judge found that one of PPC's goals in the idling of the El Dorado facility was to reduce the supply of commodity chicken and thereby pressure prices upward. Reasoning that the magnitude of PPC's operations and actions was likely to lead to a competitive injury, the magistrate judge concluded that PPC's actions violated

3

No. 12-40085

PSA § 192(e). To remedy PPC's violation, the magistrate judge awarded over $25 million to the chicken growers as part of the final judgment. The magistrate judge resigned soon after issuing the judgment, and a district judge ruled on the post-judgment motions. PPC now appeals.

## II.

We review a district court's findings of fact for clear error and its conclusions of law de novo. *City of New Orleans v. BellSouth Telecommunications, Inc.*, 690 F.3d 312, 322 (5th Cir. 2012).

## III.

PPC first argues that the district court erred in its conclusion that PPC's deliberate reduction in commodity chicken output constitutes an illegal manipulation of poultry prices under the PSA.

Under the relevant provision of the PSA,

> It shall be unlawful for . . . any live poultry dealer with respect to live poultry, to:
> . . . .
> (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices . . . .

7 U.S.C. § 192(e). In finding a violation of § 192(e), the district court's analysis was simple: If PPC hoped to increase chicken prices by reducing the quantity of chicken offered on the market, then it had attempted to manipulate chicken prices and thereby violated the PSA. However, PPC contends that the district court's simplistic interpretation of § 192(e) is flawed. Specifically, PPC argues that § 192(e) is an antitrust statute, and therefore is only violated by attempts to affect market prices which are *anti-competitive*, or "injurious to competition." Because its output reductions were not anti-competitive, PPC asserts, it has not violated § 192(e).

No. 12-40085

In response, the growers emphasize that violations of the PSA are not strictly limited to the traditional antitrust realms of price-fixing conspiracies and monopolization. Rather, the history of the PSA supports a "wider power to prohibit unfair methods of competition than did antecedent anti-trust legislation." *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 357 (5th Cir. 2009) (en banc).

In *Wheeler v. Pilgrim's Pride*, the en banc court considered whether PPC had violated PSA §§ 192(a) or (b) by providing preferential terms of dealing to certain chicken growers. *Id.* Of particular concern to the *Wheeler* court was the broad prohibition of § 192(a), which makes it unlawful to "[e]ngage in or use any unfair . . . or deceptive practice." We first observed that "the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by *collusion* that unduly lowered the prices to the shipper and unduly increased the price to the consumer." *Id.* at 358 (emphasis added). We next reviewed the decisions of our sister circuits, which unanimously agreed that the PSA's proscription of unfair practices is aimed only at anti-competitive conduct. *See id.* at 358–60.[1] Despite the lack of any explicit language in § 192(a) requiring an anti-competitive effect, we concluded that "an anti-competitive effect is necessary for an actionable claim under the PSA in light of the Act's history in Congress and its consistent interpretation by the other circuits." *Id.* at 362.

Our decision in *Wheeler* leaves little doubt that § 192(e) proscribes only anti-competitive conduct. Moreover, unlike the broad language of § 192(a), § 192(*e*) explicitly requires a purpose or effect of "manipulating or controlling

---

[1] *See also Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010) ("The tide has now become a tidal wave . . . . All told, seven circuits—the Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits—have now weighed in on this issue, with unanimous results.") (citing cases).

No. 12-40085

prices." Because the protection of natural price levels is the object of prohibitions against anti-competitive conduct, § 192(e) is clearly directed at conduct that is anti-competitive.[2] *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

The express wording of § 192(e) bolsters this conclusion. Section 192(e) does not forbid all conduct which might affect prices, but only conduct that is designed to *manipulate* or *control* prices. In the absence of statutory definitions, "manipulation" ordinarily requires the use of deceptive or unfair means to accomplish something;[3] "control" connotes the exercise of power or force to accomplish something that would not happen in the absence of interference.[4] By using the words "manipulate" and "control" in § 192(e), Congress thus prohibited

---

[2] Even the dissent in *Wheeler* conceded a requirement of anti-competitive effect in § 192(e): "Subsections (c)–(e) [of § 192], unlike subsections (a) and (b), prohibit only those acts[] which have the effect of 'restraining commerce' or which produce another common antitrust injury, such as 'creating a monopoly.'" *See Wheeler*, 591 F.3d at 374 (Garza, J., dissenting). Although divided as to the meaning of § 192 (a)–(b), the *Wheeler* en banc court was thus unanimous that § 192(e) is not violated absent a showing of anti-competitive conduct.

[3] *See, e.g.*, *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12 (1985) ("We hold that the term 'manipulative' as used in [Securities Exchange Act] § 14(e) requires misrepresentation or nondisclosure. It connotes 'conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" (citation omitted)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) ("['Manipulative'] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."); OXFORD ENGLISH DICTIONARY (defining "manipulate" to mean "to manage, control, or influence in a subtle, devious, or underhand manner;" "to cause (stocks, currency, a commodity, etc.) to rise or fall in value by affecting the market illicitly, improperly, or by contrived methods").

[4] *See, e.g.*, *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 757 (9th Cir. 2012) ("Control means 'to exercise restraint or direction over; dominate, regulate, or command.'" (citation omitted)), *petition for cert. Filed* (July 11, 2013) (No. 13-63); *Marcus & Millichap Inv. Servs. of Chicago, Inc., v. Sekulovski*, 639 F.3d 301 (7th Cir. 2011) ("'[C]ontrol means that the employer has the right to control and direct the worker . . .'" (citation omitted)); OXFORD ENGLISH DICTIONARY (defining "control" to mean "to exercise restraint or direction upon the free action of; to hold sway over, exercise power or authority over; to dominate, command").

only deceptive, illegitimate, or unnatural—*i.e.*, anti-competitive—attempts to influence prices.

The relevant question thus becomes whether PPC's decision to reduce its chicken output was improper and anti-competitive. When evaluating competitive injury, we ordinarily rely upon a "rule of reason" analysis: in light of all the relevant facts, an action is unlawful only if it is likely to suppress or destroy competition. *See Am. Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2216–17 (2010).[5]

The growers' alleged injury to competition stems entirely from PPC's alleged intent to influence prices. However, we remain conscious of the fact that laws against anti-competitive conduct seek to protect competition, not low prices. Competition, of course, is merely the existence of genuine commercial rivalry. While we agree that a goal of competition is lower price levels, a unilateral attempt to raise prices, without more, is not inherently illicit or anti-competitive.[6] As the Supreme Court explained in *Spectrum Sports, Inc. v. McQuillan*,

> The purpose of [antitrust law] is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

506 U.S. 447, 458 (1993). Moreover, because healthy competition depends on individual firms aggressively pursuing their own interests, we are particularly

---

[5] *See Pickett v. Tyson Fresh Markets, Inc.*, 420 F.3d 1272, 1280–85 (11th Cir. 2005) (applying de facto rule of reason analysis in PSA case); *IBP, Inc. v. Glickman*, 187 F.3d 974, 977–78 (8th Cir. 1999) (same).

[6] *See* OXFORD ENGLISH DICTIONARY (defining competition as "the action of endeavouring to gain what another endeavours to gain at the same time; the striving of two or more for the same object; rivalry").

hesitant to condemn the unilateral act of a single firm.[7] *See also Armour & Co. v. United States*, 402 F.2d 712, 717 (7th Cir. 1968) (finding that absent "predatory intent" or "the likelihood of injury to competition," the PSA is not violated).

In the instant case, PPC had overextended itself into the commodity chicken market, was producing more chicken than the market appeared to need, and was thereby driving the market price of chicken down at great cost to itself. Recognizing the damage inflicted by its own excess production, PPC wisely decided to stop flooding the market with unprofitable chicken.[8] Not surprisingly, we have located no case finding such conduct to be unfair, illegal, or injurious to competition; in truth, PPC's unilateral conduct had nothing to do with competition. Even if PPC hoped that chicken prices would respond to the output reduction by settling at a higher equilibrium price, that would not alter our conclusion.[9] Far from being a nefarious goal, higher prices are the natural consequence of a reduction in supply.[10] If it is lawful for a business to independently control its own output, then it is also lawful for the business to hope for the natural consequences of its actions.[11]

---

[7] *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–69 (1984).

[8] This is not the type of pro-competitive business justification which arguably must be properly pled as an affirmative defense to a prima facie showing of anti-competitive conduct. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984). This is merely evidence relevant to whether there was any underlying anti-competitive conduct to begin with. *See American Needle*, 130 S.Ct. at 2216–17.

[9] *See American Needle*, 130 S.Ct. at 2216 n.10 (recognizing that even a devious intention will not necessarily de-legitimize an otherwise permissible act, "'because knowledge of intent [is to] help the court to interpret facts and to predict consequences.'" (quoting *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918)).

[10] *See* PAUL A. SAMUELSON, ECONOMICS 56–60 (11th ed. 1980).

[11] We separately note that the district court found that PPC did not violate PSA § 192(a) because it did not engage in any "unfair" or "deceptive" practices. As some courts have described this provision as the PSA's "catchall," it would be anomalous to conclude that PPC

No. 12-40085

PPC's conduct was merely the legitimate response of a rational market participant to changes in a dynamic market. If a firm inadvertently over-produces a good and drives down prices, it does not break the law by cutting production so that prices may recover. We therefore hold that PPC did not violate PSA § 192(e) by reducing its commodity chicken output.

## IV.

For the reasons stated above, the judgment of the district court is REVERSED, and judgment is RENDERED in favor of PPC.

REVERSED and RENDERED.

---

did not do anything unfair or deceptive, but that it did illegitimately attempt to manipulate or control prices. *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1229 (10th Cir. 2007).

While a better argument could be made that PPC violated the PSA by intentionally creating a chicken supply shortage, nothing in the record supports that assertion. Moreover, in the months following the El Dorado facility's idling, the total domestic supply of commodity chicken actually *increased*. Thus, the chicken processing industry either had enough new entrants or enough unused capacity to immediately compensate for any supply shortage created by PPC.